**The STEWART B. McKINNEY FOUNDATION, INC.**

v.

**TOWN PLAN AND ZONING COMMISSION OF the TOWN OF FAIRFIELD, et al.**

**Civ. No. B–90–115(EBB).**

United States District Court,
D. Connecticut.

April 1, 1992.

---

Philip D. Tegeler, Shelley Geballe, Connecticut Civil Liberties Union Foundation, Hartford, Conn., Jennifer L. Forrence, Ann M. VanDEventer, Jonathan Orleans, Zeldes, Needle & Cooper, Bridgeport, Conn., for plaintiff.

Donal C. Collimore, Fairfield, Conn., Patrick W. Shea, John S. McGeeney, Paul Hastings Janofsky & Walker, Stamford, Conn., for defendants.

## RULING ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

ELLEN B. BURNS, Chief Judge.

The plaintiff, the Stewart B. McKinney Foundation, Incorporated, has brought this civil rights action claiming the decision of the defendant, Fairfield Town Plan and Zoning Commission, to require the plaintiff to obtain a special exception for its intended use of a two-family residence it owns is discriminatory. The Complaint alleges the Commission's decision violates Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3601 *et seq.*, as amended; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; the Connecticut Zoning Enabling

Act; and the due process and equal protection guarantees of the Connecticut Constitution. The plaintiff invokes jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3) and (4), and under 42 U.S.C. § 3613.

On September 26, 1990, the plaintiff, pursuant to Federal Rule of Civil Procedure 65(a), moved for a preliminary injunction seeking an order from the court enjoining the defendants from requiring a special exception or from taking any zoning enforcement action against the plaintiff or the plaintiff's future tenants for failure to obtain a special exception. A five-day hearing was held on the plaintiff's motion on April 1–5, 1991. The court heard oral argument on the plaintiff's request for injunctive relief on September 9, 1991. The Connecticut Legal Aid Society of Hartford and the Connecticut AIDS Residence Coalition filed a joint *amici curiae* memorandum of law in support of the plaintiff's motion.

The plaintiff relies on its Fair Housing Act claim in support of this motion, claiming the Commission's decision violated its rights under 42 U.S.C. §§ 3604(f)(1), 3617, and 3604(f)(3)(B). The defendants contend the Commission's decision was reasonable and within its power and, therefore, not in violation of the Fair Housing Act.

For the reasons set forth below, the court grants the plaintiff's motion for a preliminary injunction.

FACTS

The court finds the following facts based on a review of the record and the evidence adduced at the hearing on plaintiff's motion for injunctive relief.

The Stewart B. McKinney Foundation, Incorporated (hereinafter the Foundation) is a nonprofit corporation organized under the laws of the State of Connecticut. Complaint at 2. The purpose of the Foundation is to provide shelter, relief, support, and assistance to individuals with serious illnesses, to provide a community relationship for such individuals and their families, and to provide such services specifically to those needy, poor, and indigent individuals with terminal illness. Stipulation dated April 1, 1991, ¶ 2. The Foundation holds a tax-exempt status under the Internal Revenue Code. Transcript at p. 124.

The defendant Town Plan and Zoning Commission of the Town of Fairfield (hereinafter the Commission) is the municipal agency designated by the Charter of the Town of Fairfield (hereinafter the Town) to adopt, interpret, and administer the Zoning Regulations of the Town. Complaint at 2, Answer at 2. The Town is vested by the State of Connecticut with authority, pursuant to Conn.Gen.Stat. § 8–1 *et seq.*, to establish zoning regulations and to regulate the use of property through its Plan and Zoning Commission.

Defendant Myron Hinckley is, and at all times pertinent to this case has been, the chairman of the Commission. Complaint and Answer, ¶ 7. Defendant Joseph E. Devonshuk, Jr. is, and at all times pertinent to this case has been, the Director of Planning and Zoning of the Town, and the secretary to the Commission. Complaint and Answer, ¶ 8. Defendant Edwin Buddenhagen is the Zoning Enforcement officer of the Town. Complaint and Answer, ¶ 9. Each of these defendants is sued in his official capacity.

AIDS (Acquired Immune Deficiency Syndrome) is an acquired illness of the immune system that reduces the body's ability to fight certain types of opportunistic infections and cancers. The Human Immunodeficiency Virus (HIV) is the cause of this illness. Exhibit 112. At the preliminary injunction hearing, plaintiff offered Dr. Robert W. Lyons as an expert witness in the treatment and medical needs of HIV-infected persons and persons with AIDS, and also as an expert in the nature and growth of the AIDS epidemic. The court finds Dr. Lyons is qualified as an expert in these fields.[1] The defendants did not at-

---

1. Dr. Lyons is the director of the section of infectious diseases and epidemiology at St.

tempt to refute or rebut Dr. Lyon's testimony by offering its own expert.

Dr. Lyons explained the difference between the terms "HIV infection" and "AIDS." AIDS is the terminal part of the long continuum of HIV infection. To be classified as having AIDS, a patient must meet the so-called CDC[2] criteria which dictate the patient has to be infected with the HIV virus and also have one of a variety of infectious diseases or tumors which a person with a normal immune system would not normally be expected to have. Transcript at p. 243. All HIV-infected persons are handicapped within the meaning of the Fair Housing Act. Stipulation dated April 1, ¶ 6.

Dr. Lyons testified that HIV-infected people can be categorized into four groups based on their medical needs and level of disability. Persons in the first group are infected with the HIV virus but may not even know they are infected; they are asymptomatic and require no special medical care. Persons in the second group do not have any AIDS-defining illness but they begin to develop some symptoms, often including severe fatigue. They may have trouble holding a job and may require some medication and some sort of medical surveillance but do not generally require in-home care. Persons in the third group are those who are seriously ill. They may require hospitalization; they get sick and then recover. Their symptoms can include pneumonia, weight loss, diarrhea, meningitis, and infrequently, cytomegalovirus retinitis. These people are usually able to live in the community. Their medical needs are generally handled through clinic or doctor's office visits, although a small number of persons in this group require at-home administration of intravenous drugs. Persons in the fourth and terminal phase are

those who are essentially dying of the AIDS virus or of any of the infections or tumors associated with it. These people are usually bedridden and require hospitalization or hospice-type care. People often enter this stage of the disease during a hospital stay. Transcript at pp. 254–261. Dr. Lyons stated that people do not tend to "crash" acutely with the HIV disease; it tends to be a more slowly progressive problem even when they get sicker. Transcript at p. 267.

AIDS is, and will continue to be, a major public health problem in Connecticut and nationally. Exhibit 112. Dr. Lyons testified about the state of the epidemic in Connecticut. In March of 1991, Connecticut passed the 2,000 mark in AIDS infections. Dr. Lyons explained that the only solid data is on AIDS because AIDS is a reportable disease. He estimated that in Connecticut there are about 16,000 cases of HIV-infected persons.[3] Of the reported cases of AIDS, 530 persons resided in Fairfield County at the time of their diagnosis. Dr. Lyons estimated approximately 4,250 HIV-infected people are living in Fairfield County. Transcript at pp. 251–254. There has been an increase in Connecticut and elsewhere of intravenous drug use related AIDS, heterosexual AIDS, AIDS among women who are sexual partners of intravenous drug users, and in the children of such women. About one in 250 births in the major cities in Connecticut are to women who are infected with the AIDS virus. Transcript at p. 252.

HIV-infected people in Connecticut face serious shortages of housing. Exhibit 107 at p. 3; Exhibit 112 pp. 26–27; Memorandum of Law of *Amici Curiae* at p. 2. *See also* Transcript at p. 118 (Mrs. McKinney testified the Foundation has received inquiries from persons infected with the vi-

Francis Hospital in Hartford. He is also a professor of medicine at the University of Connecticut and an associate clinical professor at the Yale Medical School. Dr. Lyons is also on the attending staff at Bradley Memorial in Southington and has a consulting appointment at Manchester Hospital. A substantial part of his practice involves treating HIV-infected persons. He has published a number of abstracts and a couple of publications with state and local

government in the area of AIDS and HIV infection and has worked in the area of AIDS and HIV policy.

**2.** CDC is the abbreviation for the National Center for Disease Control in Atlanta.

**3.** Dr. Lyons testified on April 2, 1991. His estimates, therefore, are outdated.

rus in need of housing). Affordable, adequate, and appropriate housing is one of their most critical needs. Exhibit 112 at p. 26. Independent, minimally supervised housing for persons is needed in Connecticut, especially in the Greater Bridgeport area. Exhibit 107 at p. 4.

In August of 1988, the McKinney Foundation purchased a two-family house located at 891–893 Oldfield Road in Fairfield. The Foundation intends to rent this house to no more than seven HIV-infected persons who are presently homeless or at risk of homelessness. Transcript at p. 48. Exhibit 40. Mrs. Lucie McKinney, the Foundation's chairwoman, testified at the hearing that the Foundation does not intend to provide services to the residents in the House. Transcript at pp. 48–49. The Foundation does plan to have one staff person at the house who would be responsible for physical maintenance of the property, enforcement of the lease agreements, coordination of the tenants' access to available community services such as transportation and medical services, and assistance with obtaining public benefits. *Id.* In the consideration of applications for occupancy at the property, the ability to pay rent will not be a condition of admission. Stipulation dated April 1, 1991. It will be a condition of tenancy, that the tenant be HIV-infected, or be the spouse, parent, child, or companion of another tenant who is HIV-infected. Exhibit 161. It will also be a condition of tenancy that the tenant, immediately prior to occupying the property, be homeless or at risk of homelessness. *Id.*

Shortly after purchasing the house, the Foundation made public the fact it had bought a house and intended to use it as a residence for homeless HIV-infected persons, but did not publicize its location. Transcript at p. 61. Mrs. McKinney testified she told the Town's First Selectman, Jacqueline Durrell, of the purchase and Mrs. Durrell's reaction was "Great, Fairfield is a loving, open town." Transcript at p. 222. On September 6, 1988, representatives of the Foundation met at Town hall with Town officials to discuss whether the location of the proposed residence should be disclosed. Transcript at pp. 61–64; 361–362. Joseph Devonshuk, the town director of Planning and Zoning, was present at this September 6th meeting but no discussion of zoning took place. Attorney Lehn, counsel for the Foundation, was not present at this meeting. Transcript at p. 650. Mrs. Durrell urged the Foundation to disclose the location of the house but the members of the Foundation were adamantly opposed to doing so. Mrs. McKinney was, however, persuaded to meet with the immediate neighbors of the Oldfield property. The following evening, Mrs. McKinney and other representatives of the Foundation met with the neighbors at the Oldfield house. At the meeting, some of the neighbors expressed fear of AIDS and some made discriminatory remarks about HIV-infected persons, but they agreed not to disclose the location of the house to the public. Transcript at pp. 65–71. By the next morning, however, the media knew of the location. Transcript at p. 71.

The following evening, September 8, 1988, the Foundation sponsored a public information forum that was attended by approximately 200 people. Transcript at pp. 72–73. Although some of those present supported the proposal, the crowd was quite hostile and the majority of the speakers were opposed to the plan. Transcript at pp. 363–364; 650. Bigoted remarks were made. Mrs. McKinney testified that "it was extremely riotous.... It was totally out of control ... Again it was nigger, it was spics, it was druggie, it was whore." Transcript at p. 74. After the public forum, the neighbors of the Oldfield property organized themselves into a group called the "Concerned Neighbors of Fairfield" (hereinafter CNF) and hired an attorney, John Fallon. Transcript at p. 87. Mr. Fallon was a member of the Fairfield Police Commission and his practice involved a great deal of work before the Zoning Commission. Transcript at pp. 366–367. On September 16, 1988, representatives of CNF met with Mrs. Durrell in her conference room. Mrs. Durrell agreed with CNF that the Oldfield property was the wrong location for an AIDS residence. Transcript at p. 367. CNF also held a rally and a

press conference at the Fairfield Education Center which was attended by approximately 250 people. Transcript at p. 369–370. Mrs. Durrell's office received numerous calls and letters concerning the Foundation's proposal, most of which were opposed to the residence.

After the public forum, Mr. Lehn contacted Mr. Devonshuk to arrange a meeting so that the Foundation could find out from the town officials what they could do with the house in accordance with the applicable zoning requirements. Transcript at p. 652. Based on Attorney Lehn's initial description of the proposed use, Mr. Devonshuk testified he told Mr. Lehn such a use was permitted in a residential zone subject to securing a special exception. Transcript at p. 715. Attorney Lehn asked Mr. Devonshuk to have as many involved town officials be present at the meeting as possible. Mr. Devonshuk told Attorney Lehn that Attorney Fallon, counsel for CNF, would also be present. Transcript at p. 653.

The meeting took place on September 20, 1988 in the office of Roy Ervin, the Town attorney, with Joseph Devonshuk, Arthur Leffert (the Town health director), John Fallon, David Lehn, and Roy Ervin present. At the meeting, Attorney Lehn requested information about what the Foundation was permitted to do with the property without triggering special zoning requirements, and Mr. Devonshuk asked questions about the proposed use of the property. Transcript at pp. 654, 717. The health director stated the Foundation would have to get a certificate of rental occupancy and, at Attorney Lehn's request, he and the town attorney agreed the town could waive the requirement of a listing of the occupants' names in order to protect the residents' confidentiality.[4] Transcript at p. 654. Attorney Fallon urged that a public hearing be held. Transcript at pp. 654–655. Attorney Lehn responded that the zoning commission could not have a public hearing without a zoning application and the Foundation would not make an application be-

cause it wished to avoid a confrontation. Transcript at pp. 679–680.

Mr. Devonshuk did not provide Attorney Lehn with much information and testified he told Mr. Lehn that Lehn should be telling him what the Foundation planned to do with the property not asking him what the Foundation could do with the house. Transcript at p. 717. During the meeting, Mr. Devonshuk told Attorney Lehn he would like to give to the Foundation a list of questions by letter about how the property would be used. Transcript at p. 655. Attorney Lehn told Mr. Devonshuk he thought such an inquiry was inappropriate and the Foundation would use the property in a manner which zoning regulations permitted. *Id.*

Following the meeting, Mr. Devonshuk sent the Foundation a letter dated September 23, 1988, asking thirteen questions about the proposed residence. Exhibit 23. In this letter, the Commission stated: "Although some of the information requested may not be relevant to zoning concerns, it is requested that you provide it due to the uniqueness of the situation in order to provide us with as full a picture as possible of the manner in which the property is to be used." *Id.* Mr. Devonshuk testified that the questions relating to the average age of the occupants, the disposal of garbage, and the name of the record title holder to the property were not related to zoning concerns. Transcript at pp. 720–721.

The defendants claim the other questions were relevant to zoning; the plaintiff contends they were irrelevant. These other questions involved standards of admission, number of people who would live at the property, average anticipated length of time individuals would reside in the property, the type of medical care that residents would require, how the determination of the time when an occupant must leave would be made, leases, payment of rent and other expenses, staffing of the property, services or facilities that would be pro-

---

**4.** The Foundation subsequently applied for, and obtained, a certificate of rental occupancy. Ex-

hibit 54.

vided at the property, and transportation. The defendants have admitted the Commission's determination that the proposed use of the Foundation's property required a special exception was not based on any threat to the health or safety of residents of the Town from the fact that the residents will be HIV-infected. Transcript at p. 244.

Attorney Lehn sent the Commission a short letter dated September 26, 1988 summarizing the proposed use of the property. He testified he did not, however, immediately respond to the thirteen questions because he felt they were inappropriate. Transcript at p. 662. Also, about this time, Mrs. Durrell proposed an alternate site for the residence which put the idea of the Oldfield residence in the background. *Id.* On October 1, 1988, she suggested that town land on the grounds of Roger Ludlowe High School located close to Interstate Route 95, adjacent to a nursing home and far away from other residences, be leased to the Foundation as an alternative to the Oldfield residence. Transcript at p. 372. In a statement Mrs. Durrell made on the day she announced this proposal she explained her reason for doing so:

> I make this proposal assuming that the people of Fairfield have been honest with me and themselves. 80 to 90% have stated that they are primarily upset about the location of this home in a residential area.... but agree with the concept of having AIDS homes.... I do feel that the concept of AIDS homes is morally defensible. I also am not comfortable, at this time, to have such a home placed in a heavily populated residential area.

Exhibit 62.

There was much opposition to the new proposal. Transcript at p. 378. Neighborhood organizations representing property owners close to the proposed Ludlowe property were adamantly against it. Transcript at pp. 379–380. Mrs. Durrell appointed a Task Force to study her Ludlowe proposal. Members included Mrs. McKinney, a CNF representative, a representative of the neighborhood organization from the Ludlowe School area, Mr. Devonshuk,

and Mrs. Durrell among others. Transcript at pp. 386–387. This Task Force met several times and its meetings were well-attended by the public. The dominant sentiment expressed by members of the public was opposition to any residence for HIV-infected persons in Fairfield. Transcript at pp. 98–99; 386–389.

The Foundation answered the Commission's thirteen questions on November 30, 1988. Exhibit 40. Attorney Lehn testified the response letter was an attempt to try to redirect the focus to the Ludlowe property and away from the Oldfield residence. Transcript at p. 663. The letter described the three different types of properties needed by displaced persons with AIDS: residences, facilities similar to a group home, and intermediate care facilities. The letter also stated the Oldfield property would be utilized simply as a residence and the Foundation did not intend to utilize the Oldfield property unless the Ludlowe proposal failed. The Foundation addressed each of the numbered questions although its responses were not very detailed. The letter reiterated that no medical care or health-related services would be provided to the occupants by the Foundation. The Foundation did not specify the type of medical care the occupants would require. Exhibit 40. In the beginning of December of 1988, as a result of community opposition, Mrs. Durrell withdrew the Ludlowe proposal. Exhibit 39.

At its December meeting, the Commission decided the Foundation's proposed use of its property required a special exception. The court finds it is unclear from the record how this issue came to be on the Commission's agenda. Attorney Lehn testified he did not request that it be; Mr. Devonshuk testified he did not remember but the standard procedure when an applicant disagrees with his determination is to refer the matter to the Commission for its decision and this is usually done at the request of the applicant. Transcript at pp. 665, 731. No representative of the Foundation attended the meeting. Mr. Devonshuk testified he believed he told Attorney Lehn the matter was on the Commission's agenda although he could not recall specifically.

**1206**

Mr. Lehn testified he did not remember being notified but, if he had been, he doubted he would have attended because the Foundation had not made any application of any sort to the Commission and did not want it to take any action. Transcript at pp. 732, 666. The documents before the Commission at the December meeting were Mr. Devonshuk's letter of September 23 and Mr. Lehn's response of November 30. Mr. Devonshuk also briefed the Commission orally on the proposed use of the Foundation's property and advised the Commission that, in his opinion, a special exception was required. Devonshuk Deposition Vol. I at pp. 69–71.

Following the Commission's meeting, Mr. Devonshuk sent Mr. Lehn a letter dated December 16, 1988 notifying the Foundation that "based on the outline of information describing the types of properties which are needed by displaced persons with AIDS (as outlined in your letter of Nov. 30, 1988), these residences are permitted in all residential and business zones, subject to securing a Special Exception." Exhibit 45.

On February 21, 1989, the Commission responded to a request by the Connecticut Civil Liberties Union Foundation (hereinafter CCLUF) pursuant to the Freedom of Information Act concerning the property at 891–893 Oldfield Road. In the cover letter to this response, the Commission stated:

> Attached please find information requested concerning proposed group homes for persons infected by the Human Immune Deficiency Virus (HIV). Please be advised that the Town Plan and Zoning Commission, at this time, has not taken any specific action relative to any application for such a group home. The Commission's action (copy enclosed), taken Dec. 13, 1988, was to verify the Staff's interpretation of the Zoning Regulations that this group home use is permitted, subject to securing a Special Exception, Sect. 27.0.... See Sect. 8.2.7 and 8.2.8 ...

Exhibit 46. The Foundation had never submitted a zoning application to the Commission.

By letter dated May 31, 1989, the CCLUF, on behalf of the Foundation, formally requested a reconsideration and reversal of the Commission's December decision requiring the Foundation to secure a special exception. The CCLUF contended the proposed use was within the definition of a "family" under the Town's zoning regulations, and the imposition of the special exception requirement violated the Fair Housing Act. Exhibit 56. The CCLUF also stated neither § 8.2.7 nor § 8.2.8 of the Regulations required a special exception for the proposed use of the property nor did these sections support the Commission's characterization of the proposed use as a group home. The CCLUF argued that the definitional sections of the Regulations also did not support this characterization. Exhibit 56.

The Commission responded with a written letter to the CCLUF, dated July 12, 1989, reaffirming its earlier finding that a special exception was required. In this letter, the Commission referred to the three very different types of properties needed by displaced HIV-infected persons described by the Foundation in its letter dated November 30, 1988 as if they were the same. The Commission concluded all these uses are those of a charitable institution and are consistent with a chronic nursing home care use. Exhibit 505.

The Commission cited § 31.1 of the Fairfield Zoning Regulations (hereinafter the Regulations) which states that words used in the regulations shall have the meaning commonly attributed to them and doubts as to their precise meaning shall be determined by the Commission. The Commission referred to dictionary definitions of the terms, "charitable institution," "chronic," and "nursing." The Commission also stated it had reviewed special exception applications for similar uses in the past and, most recently, had approved an exception for a homeless shelter in downtown Fairfield. *Id.*

On September 11, 1989, the CCLUF, on behalf of the Foundation, again requested a review of the Commission's decision because, it asserted, the description of the

property given by the Commission in its letter of July 12, 1989 was inconsistent with the information provided to the Commission by the Foundation. The Commission never responded to this letter. The Foundation has never applied for a special exception for the Oldfield property.

The Oldfield property is located in a Residence B zoning district. Complaint and Answer ¶ 18. Under the Regulations, one and two-family residences are permitted uses of property in this type of zone. Exhibit 506, Regulations §§ 8.2.1–8.2.2. The Regulation's definition of a family includes a group of not more than five unrelated persons, plus domestic servants or guests, who live together as a single housekeeping unit maintaining a common household. Exhibit 506, Regulation § 31.2.6.

The terms "charitable institution" and "chronic and convalescent nursing home" are not specifically defined in the Regulations. Exhibit 506. The Regulations state that the words used shall have the meaning commonly attributed to them and doubts as to their precise meaning shall be determined by the Commission in accordance with the purpose and intent of the Regulations. Exhibit 506, Regulation § 31.1. Property in a Residence B zone may be used as a charitable institution or as a chronic and convalescent nursing home if the Commission grants a special exception. Regulations §§ 8.2.7–8.2.8. The plaintiff presented a professional planner, Charles Vidich, as an expert on planning and zoning theory and Connecticut planning and zoning practice. Mr. Vidich testified that, when zoning regulations do not define a term that is used, it is common practice to look to statutory sources referred to in the regulation section containing the undefined term for their definition of the term. Transcript at p. 567. Mr. Vidich testified he would rely on such a statutory definition over a dictionary definition. *Id.*

The requirements and procedures for obtaining a special exception are set out in § 27 of the Regulations (as amended 10/24/89). § 27 refers to the Health Code of the State of Connecticut when discussing special exceptions for chronic and convalescent nursing homes. Exhibit 506, Regulation § 27.4.5. The term "chronic and convalescent nursing home" is defined in the Connecticut Public Health Code as "a long-term institution having facilities and all necessary personnel to provide skilled nursing care under medical supervision and direction to carry out simple, non-surgical treatment and dietary procedures for chronic diseases or convalescent stages of acute diseases or injuries." The Public Health Code, Section 19–13–D1(b)(3)(c). If the Foundation operated the property as described in Attorney Lehn's letter to Mr. Devonshuk dated November 30, 1988, and in the plaintiff's answers to interrogatories numbers 1 and 2, the Foundation would not be required to be licensed under the state public health code's chronic and convalescent nursing home provisions. Stipulation dated April 4, 1991.

Operation Hope, a homeless shelter for men,[5] applied to the Commission for a special exception in January of 1987. The exception was granted in March of 1987. This shelter houses eighteen unrelated individuals at night. These individuals are not allowed to remain in the shelter during the day. Transcript at p. 175. It is located in a former police station, not a private home. There was some neighborhood opposition to the proposed facility. Transcript at p. 743. *See also* Exhibit 524.

DISCUSSION

The plaintiffs seek a preliminary injunction enjoining the defendants from requiring a special exception, or from otherwise taking any zoning enforcement action against the plaintiff or the plaintiff's future tenants for failure to obtain a special exception for the property on Oldfield Road.

"[A] preliminary injunction is an extraordinary remedy that should not be granted as a routine matter." *JSG Trading Corp. v. Tray–Wrap, Inc.,* 917 F.2d 75, 80 (2d

---

5. Operation Hope applied for a second special exception in June of 1990 to allow the facility to be expanded to also accommodate a women's dormitory. This exception was granted. Exhibit 524.

Cir.1990). The standards for granting injunctive relief are well established in the Second Circuit. *Joseph Scott Company v. Scott Swimming Pools, Inc.*, 764 F.2d 62, 66 (2d Cir.1985). The district court may grant a preliminary injunction if the moving party establishes (1) irreparable harm and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claim to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party. *Plaza Health Laboratories, Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir.1989).

A. Irreparable Harm

■ Irreparable harm means injury for which a monetary award cannot be adequate compensation. *Jackson Dairy, Inc. v. H.P. Hood & Sons*, 596 F.2d 70, 72 (2d Cir.1979). Recent Second Circuit decisions have stressed the importance of a showing of irreparable harm by the moving party: " 'Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered.' " *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 275 (2d Cir.1985) (quoting *Bell & Howell: Mamiya Co. v. Masel Supply Co. Corp.*, 719 F.2d 42, 45 (2d Cir.1983)). *See also Borey v. National Union Fire Insurance Co.*, 934 F.2d 30, 34 (2d Cir.1991); *Buckingham Corp. v. Karp*, 762 F.2d 257, 262 (2d Cir.1985).

The plaintiff claims irreparable harm is established by proof of a violation of the Fair Housing Act (hereinafter the Act). Defendants argue such a presumption of irreparable harm has only been applied in cases where specific individuals have been denied housing and, even when applied, it is rebuttable. Defendants further argue the presumption does not apply in this Circuit, citing employment discrimination cases.

Section 42 U.S.C. § 3613(c) of the Act specifically provides for injunctive relief. Although the Second Circuit has never addressed whether irreparable harm is presumed by a showing of a violation of the Act, other courts that have considered this issue have found such a presumption. *See, e.g., Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1423 (11th Cir.), *cert. denied*, 469 U.S. 882, 105 S.Ct. 249, 83 L.Ed.2d 187 (1984) (agreeing with district court that irreparable injury may be presumed from the fact of discrimination and violation of fair housing statutes); *Baxter v. City of Belleville, Ill.*, 720 F.Supp. 720, 734 (S.D.Ill.1989) (stating Seventh Circuit has held that traditional showing of irreparable harm is not required when a plaintiff seeks equitable relief to prevent the violation of a federal statute which specifically provides for injunctive relief); *Bronson v. Crestwood Lake Section 1 Holding Corporation*, 724 F.Supp. 148, 153 (S.D.N.Y.1989) (citing *Gresham* for the proposition when housing discrimination is shown it is reasonable to presume that irreparable injury flows from the discrimination); *See generally* 7 *Moore's Federal Practice* ¶ 65.04[1] (n. 72) (1991) ("If the preliminary injunction is sought under a statute which expressly authorizes such relief, irreparable injury need not be demonstrated and it is sufficient to show that the statutory conditions have been met.").

The court finds irreparable harm may be presumed in this case because, as discussed below, the plaintiff has presented sufficient evidence to establish that its rights under the Act have been violated. The court agrees with the defendant that this presumption is rebuttable. *See Gresham*, 730 F.2d at 1423. The defendants have not demonstrated to the court, however, that any injury the plaintiff would suffer would not be irreparable. Therefore, the defendants have not rebutted the presumption of irreparable harm. *Id.*

■ The plaintiff is a nonprofit Foundation dedicated to providing shelter and help to needy persons with terminal illnesses. It has purchased the property in question in an attempt to continue in its efforts to effect that goal. The house remains empty pending a determination of the merits of the action. The plaintiff's goals are thwarted by each passing day. The court has found there is a serious shortage of

housing in Connecticut for HIV-infected persons. The plaintiff's Chairwoman has testified she has received calls inquiring as to the availability of the housing from prospective tenants whom she has been forced to turn away. Transcript at p. 118. Monetary damages would not adequately compensate the plaintiff for its inability to achieve its purpose of providing housing in the Oldfield property to needy HIV-infected persons pending a final determination of this action. Therefore, the plaintiff would suffer irreparable harm if a preliminary injunction did not issue.

The court finds unpersuasive the defendants' contention that the plaintiff's failure to identify specific future tenants for the property is fatal to the plaintiff's claim of irreparable harm. The plaintiff has shown irreparable harm to itself and, therefore, is not required to demonstrate irreparable harm to any future tenant.[6]

■■■ The defendants have also argued there is no irreparable harm here because the injury of which plaintiff complains is self-inflicted and could be remedied if the plaintiff agreed to apply for a special exception. The defendants misconstrue plaintiff's argument concerning its injury. The plaintiff claims that being forced to apply for a special exception in order to use its property is burdensome and discriminatory under the Fair Housing Act because it imposes special terms and conditions on the occupancy of its property that would not be imposed if the prospective tenants were not HIV-infected. Because, as will be discussed below, the court agrees with the plaintiff, it finds the plaintiff does not have to acquiesce in a violation of its rights to avoid a claim of self-infliction of injury.[7] The court concludes, therefore, the plaintiff has demonstrated irreparable harm.

### B. The Merits of the Plaintiff's Fair Housing Act Claims

The Fair Housing Act (originally enacted as Title VIII of the Civil Rights Act of 1968) was amended in 1988 with the changes effective March 12, 1989. *See* 42 U.S.C. § 3601, *et seq.* Congress expanded the Act to allow private litigants the right to challenge allegedly discriminatory housing practices and to include handicapped persons among those protected. H.R.REP. NO. 100–711, 100th Cong., 2d Sess. 13, *reprinted in* 1988 U.S.Code Cong. & Admin.News 2173, 2174.

The legislative history indicates a clear intent to include HIV-infection within the statutory definition of handicap:

> The Fair Housing Amendments [sic] Act, like Section 504 of the Rehabilitation Act of 1973, as amended, is a clear pronouncement of a national commitment to end the unnecessary exclusion of persons with handicaps from the American mainstream. It repudiates the use of stereotypes and ignorance, and mandates that persons with handicaps be considered as

---

**6.** The plaintiff, citing *Baxter v. City of Belleville, Ill.,* 720 F.Supp. at 730–731, asserts it also has standing to seek preliminary relief on behalf of its prospective tenants. Neither party has adequately addressed this issue; therefore, the court does not consider it. The court finds, however, that the defendants' actions do interfere with the ability of prospective tenants to obtain housing on the same terms and conditions as non-infected persons. Because the Foundation's goal is to provide housing to needy HIV-infected persons, to the extent future residents would be harmed by the defendants' actions, it is also.

**7.** The Court notes it is bothered, as are the defendants, by plaintiff's delay in seeking injunctive relief. Although the Complaint was filed on 3/13/90, this motion was not filed until six months later. Since the commencement of this action, the plaintiffs have filed four motions for extension of time: two requests for extension of time to complete discovery, one request for an extension to respond to a motion to intervene, and one request for an extension of time to file a response for requests for admission. Although such delay could tend to belie a claim of irreparable harm, see *Citibank, N.A. v. Citytrust,* 756 F.2d 273, 276 (2d Cir.1985); *Costello v. McEnery,* 767 F.Supp. 72, 78 (S.D.N.Y.), *aff'd,* 948 F.2d 1278 (2d Cir.1991), the court's concern does not rise to the level of finding that it does so in this case. *See SI Handling Systems, Inc. v. Heisley,* 753 F.2d 1244, 1264 (3d Cir.), *aff'd,* 772 F.2d 896 (1985) ("[I]t is [not] important whether the movant considered a preliminary injunction necessary at the time of filing the complaint. The relevant inquiry is whether the movant is in danger of suffering irreparable harm at the time the preliminary injunction is to be issued.")

individuals. Generalized perceptions about disabilities and unfounded speculations about threats to safety are specifically rejected as grounds to justify exclusion.

. . . .

People with Acquired Immune Deficiency Syndrome (AIDS) and people who test positive for the AIDS virus have been evicted because of an erroneous belief that they pose a health risk to others.

All of these groups have experienced discrimination because of prejudice and aversion—because they make non-handicapped people uncomfortable. H.R. 1158 clearly prohibits the use of stereotypes and prejudice to deny critically needed housing to handicapped persons. The right to be free from housing discrimination is essential to the goal of independent living.

*Id.* at 2179.[8]

The plaintiff asserts its rights under the Act have been violated in three ways. Complaint at 10–11. First, it claims the Commission's decision to require the Foundation to apply for a special exception violated its rights under § 3604(f)(1) because this requirement discriminates against the plaintiff and its prospective tenants on the basis of the handicapped status of the future residents. Second, plaintiff argues this requirement also violates its rights under § 3617 because it constitutes interference, coercion, and intimidation of, and against, the Foundation because of its aid and encouragement of the rights of its prospective tenants. Finally, the plaintiff contends requiring it to apply for a special exception violates its rights under § 3604(f)(3)(B) in that the requirement constitutes a refusal to make reasonable accommodations that may be necessary to allow handicapped people equal opportunities to use and enjoy a dwelling.

To support its request for issuance of a preliminary injunction, the Foundation must establish that there is either a likelihood of success on the merits of its Fair Housing Act claims or that there are sufficiently serious questions going to the merits to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in its favor. The court finds, for the reasons discussed below, there is a likelihood of success on the plaintiff's Fair Housing Act claims under §§ 3604(f)(1) and 3617. The court further finds there are sufficiently serious questions going to the merits of the plaintiff's claim under § 3604(f)(3)(B) and that the balance of hardships tips decidedly in its favor.

1) Likelihood of Success
Under § 3604(f)(1)

Section 3604(f)(1) makes it unlawful

to discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of—

(A) that buyer or renter;

(B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or

(C) any person associated with that buyer or renter.

A plaintiff can establish a violation of this section using one of two methods. *See, e.g., Association of Relatives and Friends of AIDS Patients (A.F.A.P.S.) v. Regulations and Permits Administration or Administracion de Reglamentos y Permisos (A.R.P.E.),* 740 F.Supp. 95, 103 (D.Puerto Rico 1990); *Baxter,* 720 F.Supp. at 732; *Cason v. Rochester Housing Authority,* 748 F.Supp. 1002, 1007 (W.D.N.Y. 1990); *Familystyle of St. Paul, Inc. v. City of St. Paul, Minn.,* 728 F.Supp. 1396, 1401 (D.Minn.1990), *aff'd,* 923 F.2d 91 (8th Cir.1991). Essential to the first method is a showing by the plaintiff of discriminatory intent on the part of the defendants. The plaintiff's evidence of "discriminatory intent," however, must demonstrate only that the HIV-infected status of the plaintiff's future tenants was one factor, not the

---

**8.** The court notes that, although Congress spoke in terms of people with AIDS and people who test positive for the AIDS virus, it appears clear that Congress intended to refer to HIV-infected persons as well and that its failure to do so was the result of a prevalent "nomenclature" problem. *See Baxter v. City of Belleville, Ill.,* 720 F.Supp. 720, 729 (S.D.Ill.1989).

sole factor, in the Commission's decision to require the Foundation to apply for a special exception. *Village of Arlington Heights v. Metropolitan Housing Development Corporation,* 429 U.S. 252, 265–66, 97 S.Ct. 555, 563–64, 50 L.Ed.2d 450 (1977); *Robinson v. 12 Lofts Realty, Inc.,* 610 F.2d 1032, 1042 (2d Cir.1979). The second method, "disparate impact" analysis, considers whether the effect of a defendant's action is unnecessarily discriminatory even though the plaintiff does not show an intent to discriminate. *See Metropolitan Housing Development Corp. v. Village of Arlington Heights,* 558 F.2d 1283, 1290 (7th Cir.1977), *cert. denied,* 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978). The court will address each of these two methods in turn.

### a. Discriminatory Intent

The Second Circuit has stated that a discriminatory treatment analysis involves differential treatment of similarly situated persons or groups. *Huntington Branch, N.A.A.C.P. v. Town of Huntington,* 844 F.2d 926, 933 (2d Cir.), *review declined in part, judgment aff'd,* 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988). The court must conduct "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available" to determine whether the HIV-status of the prospective residents was at least a partial motivating factor in the defendants' decision. *Village of Arlington Heights,* 429 U.S. at 266, 97 S.Ct. at 563.

■ The intent of which the court speaks is the legal concept of intent, to be distinguished from motive. *McNeil v. McDonough,* 515 F.Supp. 113, 129 (D.N.J. 1980), *aff'd,* 648 F.2d 178 (3d Cir.1981). To prevail on its claim of discriminatory treatment, therefore, the plaintiff is not required to show the defendants were motivated by some purposeful, malicious desire to discriminate against HIV-infected persons. Nor must it prove the defendants were motivated solely, primarily, or even predominantly by the HIV-infected status of the Foundation's future tenants. It need only show the HIV-positive status of the people who were to live in the Oldfield property was a motivating factor in the Commission's decision. *Village of Arlington Heights,* 429 U.S. at 266, 97 S.Ct. at 563.

■ Under the teaching of *Arlington Heights,* invidious discriminatory purpose can be gleaned through an inquiry into the following factors: 1) discriminatory impact; 2) the historical background of the decision; 3) the sequence of events leading up to the challenged decision; 4) departures from normal procedural sequences; and 5) departures from normal substantive criteria. *Angell v. Zinsser,* 473 F.Supp. 488, 497 (D.Conn.1979). The court accepts these factors merely as a framework within which to conduct its analysis for no two cases where discriminatory treatment is alleged are alike and it is necessary that each case be evaluated on its own facts. *McNeil,* 515 F.Supp. at 129.

■ As discussed below, the court finds sufficient evidence has been presented to show the plaintiff is likely to succeed in proving the Commission's decision had a discriminatory impact; that is it resulted in discrimination against HIV-infected persons, a protected class under the Act. Therefore, this factor weighs in favor of a finding of discriminatory treatment.

The historical background and the sequence of events leading up to the challenged decision will be considered together. A look at the events occurring during the period of time between when the press learned of the Foundation's plans to rent its property and the Commission's decision reveals a town very much opposed to the idea of allowing HIV-infected persons to rent a home in a residential area. When the Foundation's plans to rent its Oldfield property to homeless HIV-infected persons became generally known, the record shows the plaintiff was met with organized, widespread, and effective opposition. The immediate neighbors formed themselves into a group and hired counsel. A public information forum sponsored by the Foundation deteriorated into an "extremely riotous" situation that "was totally out of control." Transcript at p. 74. The First Selectman's

office received many calls and letters opposed to the Foundation's plans. The neighborhood group held a rally and a press conference that were very well attended.

The defendants argue the fact that more negative views were expressed than positive ones is hardly indicative of the feelings of a majority of the electorate. The court finds, however, this was an issue that rocked a comparatively small town.[9] The record is replete with evidence showing there was significant organized opposition from the electorate to the Foundation's plans. Throughout this time period leading up to the Commission's decision, the Foundation's plans received extensive media coverage. Many town residents voiced comments evincing a complete lack of understanding of the HIV-virus and its implications. It is clear to the court that it was the HIV-status of the prospective tenants that motivated much of the opposition to the home.

The defendants also argue there is not a shred of evidence that the "handful" of people opposed to the Foundation's proposal in any way influenced the Commission's decision to require a special exception and, absent such a showing, the plaintiff can not prove discriminatory intent. The defendants' argument is similar to that raised by the defendants in *Association of Relatives and Friends of AIDS Patients*, 740 F.Supp. at 104. In that case, one very similar to the case at hand, five HIV-infected persons and an AIDS public interest group sought an injunction alleging the defendant agency's denial of the plaintiffs' special use permit to open an AIDS hospice

violated the Fair Housing Act.[10] The defendants in *Association of Relatives and Friends of AIDS Patients*, claimed the "expressions of irrational fear" were made by community members and could not be attributed to them. *Id.* The court stated:

> We agree with defendants to the extent that in the ordinary course of affairs a decisionmaker is not to be saddled with every prejudice and misapprehension of the people he or she serves and represents. On the other hand, *a decisionmaker has a duty not to allow illegal prejudices of the majority to influence the decisionmaking process.* A ... discriminatory act would be no less illegal simply because it enjoys broad public support. Likewise, if an official act is performed simply in order to appease the discriminatory viewpoints of private parties, that act itself becomes tainted with discriminatory intent even if the decisionmaker personally has no strong views on the matter.

*Id.*

 The court finds discriminatory intent can be proven through circumstantial evidence. *Id. See also Dailey v. City of Lawton, Oklahoma*, 425 F.2d 1037, 1039 (10th Cir.1970) (addressing this issue in the context of equal protection). It concludes the Commission, at the least, bowed to the political pressure exerted by the residents of Fairfield opposed to the Foundation's plans. The court's conclusion is based on its finding, discussed below, that the Commission's interpretation of the Regulations was unreasonable and, therefore, the Com-

---

**9.** Public opposition to the idea of the AIDS home in a residential area was so great that Mrs. Durrell proposed an alternative location: town property located close to the highway far away from other residences. In so doing she stated: "I also am not comfortable, at this time, to have such a home placed in a heavily populated residential area." Exhibit 62. Mrs. Durrell also appointed a Task Force to study her proposal. Many members of the public attended the meetings of this Task Force and voiced much opposition to a residence for HIV-infected persons. The fact the chief elected officer of the Town felt it necessary to propose an alternative site and to create a Task Force addressing the issue of housing HIV-infected persons dem-

onstrates the strength of the citizenry's opposition.

**10.** In *Association of Relatives and Friends of AIDS Patients*, the only reason given for the denial of the permit was that the land was zoned agricultural and that the use requested was therefore prohibited by a zoning regulation. 740 F.Supp. at 100. The court found this reason to be "less than genuine," *Id.* at 105, and granted the preliminary injunction. It found the plaintiffs had sufficiently demonstrated discrimination under both the discriminatory. treatment and the disparate impact test.

mission's stated reasons for its decision were pretextual.

The court next considers whether there was any departure from normal procedural sequences. The court finds the infamous thirteen question letter sent by Mr. Devonshuk to counsel for the plaintiff to be such a departure and evidence that the HIV status of the future tenants was a motivating factor in the Commission's decision. In fact, the letter sent by the Town's Director of Planning and Zoning explicitly states that it requests information irrelevant to zoning concerns and asks that it be provided "due to the uniqueness of the situation in order to provide us with as full a picture as possible of the manner in which the property is to be used." Exhibit 23. The defendants cannot, consistent with the Fair Housing Act, ask questions concerning the handicapped nature of tenants that are admittedly irrelevant to any zoning concern no matter how "unique" the handicap. The court finds it a departure from normal procedure.

The Foundation argues the fact the issue was on the Commission's December agenda when the plaintiff had not requested it be and had never submitted an application also demonstrates normal procedures were not followed. The court finds, however, there was not sufficient evidence presented to support such a conclusion.

Finally, the court will consider whether there was any departure from normal substantive criteria. The Commission found the Regulations required the Foundation to obtain a special exception for its proposed use of its property. The Commission stated two alternative reasons for its decision:

The property was a chronic and convalescent nursing home and it was a charitable institution. The Regulations mandate that property in a Residence B zone can only be used as a chronic and convalescent nursing home or as a charitable institution if the Commission grants a special exception.

■■■■ The defendants have argued strongly that the court should not sit as a super zoning board of appeals and should not second guess the Commission's interpretation of its Regulations. The court agrees with the defendants that, to adduce evidence of discriminatory intent, the plaintiff must show more than that the Commission's decision was wrong; it must prove the decision was so arbitrary that it likely resulted from an intent to discriminate. *See, e.g., Lieberman v. Gant*, 630 F.2d 60, 65 (2d Cir.1980). The court finds, however, the evidence supports the plaintiff's claim that the defendants conveniently seized upon the most "plausible," though improbable, sections of the zoning code to deny or delay the opening of the residence and thereby appease the mounting public opposition.

The Regulations define a family as including a group of not more than five unrelated persons, plus domestic servants or guests, who live together as a single housekeeping unit maintaining a common household. The prospective tenants of the Foundation's property satisfy this definition.[11] According to the Regulations, one- and two-family residences are permitted uses of property in a Residence B zone. According to the Regulations, therefore, the Foundation's proposed use of the property is permitted.[12]

**11.** The court finds the defendants' reliance on *Dinan v. Board of Zoning Appeals of the Town of Stratford*, 220 Conn. 61, 595 A.2d 864 (1991), to be misplaced. The defendants contend the Foundation is making the same argument as the *Dinan* court rejected: that is, as long as the number of proposed occupants does not exceed the prescribed limit, the proposed use is that of a family. The *Dinan* court, however, was considering the zoning regulations of the Town of Stratford, which define "family" completely differently than the Town of Fairfield. The *Dinan* court upheld the validity of the Stratford definition against a challenge by plaintiffs whose tenants did not satisfy Stratford's definition of fam-

ily. Unlike the plaintiffs in *Dinan,* the Foundation seeks to use its property in a manner that is a permitted use and its tenants satisfy the Town of Fairfield's definition of family.

**12.** The defendants argue the prospective tenants will not be voluntary members of a family group because they will not know each other prior to living in the house. They point to Mr. Vidich's testimony that the voluntary nature of the arrangement is a key factor in the definition of family. The court finds many groups of unrelated persons do not know each other before they live together; nonetheless, the Town has chosen to define a family in such a way as

■ The defendants' conclusion that "the uses described are that of a charitable institution and are consistent with a chronic nursing home care use," is unreasonable.[13] *See Oliver v. Zoning Commission of the Town of Chester*, 31 Conn.Sup. 197, 326 A.2d 841 (1974). The defendants argue neither term is defined in the Regulations and the Regulations state that all the words used shall have their common meaning and any doubts as to meaning are to be resolved by the Commission. Nonetheless, the court finds this does not give the defendants license to interpret these terms to include any property it, or the Town residents, wish to exclude from a particular zone based on the handicap of future tenants, a reason deemed by Congress to be illegal.

The court finds credible the testimony of Mr. Vidich that it is common practice to look to sources referred to in the regulation section containing an undefined term for a definition of that term. The Regulation dealing with special exceptions refers to the State of Connecticut Health Code which defines chronic and convalescent nursing home as "a long-term institution having facilities and all necessary personnel to provide skilled nursing care under medical supervision and direction to carry out simple, non-surgical treatment and dietary procedures for chronic diseases or convalescent stages of acute diseases or injuries." Stipulation dated April 6. The

Foundation told the defendants that it would not provide medical care or health-related services to its tenants and that no personnel will be living at the house. The court finds it was unreasonable for the Commission to make a decision that was completely inconsistent with the definition in the Public Health Code.[14] The court also notes that the record shows that if the plaintiff had operated the property in the manner in which it proposed, it would not be required to be licensed under the state public health code's chronic and convalescent nursing home provisions. Based on the information it had before it, the Commission's decision that the use was that of a nursing home was not simply wrong, it was so arbitrary as to be evidence of discrimination.[15]

■ Likewise, the Commission's conclusion that the proposed use was that of a charitable institution did not comport with the description of the use the plaintiff had given it. In a letter describing the proposed use to Mr. Devonshuk, Attorney Lehn stated:

The Foundation intends to lease each unit separately. Each unit shall be used strictly as a residence by its occupants. The Foundation intends to lease each unit to two (2) or three (3) individuals. The Foundation will not provide services to the occupants. The Foundation will

to encompass these groups. The prospective residents of the Oldfield property will voluntarily choose to live together as a family group and they satisfy the Town's definition of a family.

The fact residents may be required to leave the house once they are no longer ambulatory does not mandate the conclusion that they do not satisfy the Town's definition of a family or that the property will be run as a charitable institution. Aged or infirm members of conventional families are also often required to leave to obtain nursing home care once they are no longer ambulatory. There is no question that this does not render their family any less a family for zoning purposes.

**13.** This conclusion was stated in Exhibit 505.

**14.** The *amici curiae* note the Town regulation requires a special exception for hospitals, homes for the aged, rest homes [and] chronic and convalescent nursing homes and buildings and that each of these categories of use is separately

defined in the Public Health Code, section 19–13–D1. Memorandum of Law of *Amici Curiae* at p. 7 n. 10. The *amici curiae* also note that the Public Health Code predates the Town's regulation and that the regulation uses the precise term, chronic and convalescent nursing home, defined in the Code. *Id.* at p. 7. The court finds this further supports the court's conclusion that it was unreasonable for the Commission to render a decision which was completely inconsistent with the Health Code's definition.

**15.** The court notes Mr. Devonshuk admitted when asked that there are no chronic and convalescent nursing homes in the state that are located in residentially zoned areas. Transcript at p. 749. There are five chronic and convalescent nursing homes in Fairfield. They range from a facility containing 112 beds to one having 240 beds. *Id.* at pp. 749–750.

not conduct any of its operations from the residence.

Exhibit 26.[16] Based on this information, the Commission could not reasonably conclude the proposed use was that of a charitable institution.

The court finds the defendants confused the ownership of the property with its intended use. Connecticut courts have repeatedly found zoning is concerned with the use of the property rather than its ownership.[17] *See, e.g., Karp v. Zoning Board of City of Stamford,* 156 Conn. 287, 297, 240 A.2d 845 (1968); *Jeffery v. Planning and Zoning Board of Appeals of the Town of Greenwich,* 155 Conn. 451, 454 n. 2, 232 A.2d 497 (1967). This is consistent with the intent of the Town regulation in question which is to permit residential uses and to require a special exception procedure for non-residential uses to ascertain whether such uses would be compatible within a residential zone. The plaintiff repeatedly stated that this property was to be used solely as a residence. This is a permitted use in the zone in which the house is located. The court finds it unreasonable that the Commission ignored the description of the proposed use it was given.

The court also finds that various pieces of correspondence sent by the Commission to the Foundation and to the CCLUF demonstrate the Commission did not act reasonably based on the information provided to it. The Foundation in its November 30, 1988 response to the Commission's thirteen questions described the three kinds of properties needed by displaced persons with AIDS: residences where no services or support of any kind are provided; facilities similar to group homes where support, coordination of services, and counseling are provided but no medical care; and intermediate care facilities which provide both services and medical care. The Foundation clearly stated, "While the Ludlow facility would be similar to the "group home", the Oldfield property would be utilized simply as a residence." Exhibit 40. In its letter of December 16, 1988 notifying the Foundation of the outcome of its December meeting, the Commission treated these three types of properties as similar for purposes of zoning.[18] The court finds that, based on the Regulations and the description of the three types of properties it had received, it was not reasonable for the Commission to conclude they should all be treated the same for zoning purposes. If the people residing in these types of property described were not HIV-infected, the court finds it unlikely that the Commission would have reached the same conclusion.

In response to a Freedom of Information request by the CCLUF, the Commission ignored the Foundation's repeated assurances that the proposed use was that of a residence and referred to the proposed use of the Oldfield property as that of a "group home," the second type of property needed by HIV-infected, the plaintiff had described in its November letter to Mr. Devonshuk. In that letter, the plaintiff had explicitly stated the property would be used as a residence, not a group home. The Commission also told the CCLUF that, in December, it had decided this "group home" required a special exception but it had taken no action relative to any application for such a group home. The Commission knew when it wrote this that the Foundation had not filed any application regarding its property.

Finally, the court finds the defendants' persistent reliance on Operation Hope misplaced. Operation Hope is a homeless shelter that houses unrelated individuals at night but does not allow them to remain during the daytime hours. It is located in

---

**16.** This letter was dated September 26, 1988 and stated that it confirmed an oral discussion of September 20, 1988.

**17.** Contrary to the defendants' assertion, the *Dinan* case is consistent with this proposition. 220 Conn. at 66 n. 4, 595 A.2d 864.

**18.** In its letter, the Commission stated: "[B]ased on the outline of information describing the types of properties which are needed by displaced persons with AIDS (as outlined in your letter of Nov. 30, 1988), these residences are permitted in all residential and business zones, subject to securing a Special Exception...." Exhibit 45.

a former police station, not a residential home. The defendants point repeatedly to the fact the Commission classified Operation Hope as a charitable institution and required it to obtain a special exception which it did successfully: "[Operation Hope] a charitable institution proposing a use almost identical to that of the Foundation on behalf of non-handicapped individuals was required to obtain a special exception. There could hardly be clearer evidence that the special exception required in this case was not discriminatory." Defendants' Memorandum of Law in Opposition to Motion for Preliminary Injunction at p. 25.

Operation Hope is a charitable use and its classification as such was reasonable. It is not, however, and does not purport to be, a residence. The homeless people who sleep in this facility do not satisfy the Regulations' definition of a family. The court finds the defendants' conclusion that the proposed use of the Oldfield property is nearly identical to that of Operation HOPE to be further evidence of the Commission's refusal to accept the Foundation's portrayal of its plans for its property to be that of a residence and its steadfast insistence on treating the property differently than it would other properties in which seven unrelated people planned to live.

The court concludes the evidence demonstrates the plaintiffs have a strong likelihood of proving the HIV-positive status of the Foundation's future tenants was at least a partial motivating factor in the defendants' decision. The court finds the Commission's asserted interest in consistent zoning enforcement to be pretextual and therefore insufficient to outweigh the plaintiff's interest in the rights afforded it under the Fair Housing Act.[19] *See Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032, 1039 (2d Cir.1979).

### b. Disparate Impact

■ Although the court has found the Foundation has a strong likelihood of suc-

cess in proving a violation of the Act using a disparate treatment analysis, the court will also consider whether the plaintiff is likely, in the alternative, to succeed on the merits using a disparate impact mode of analysis. To establish a *prima facie* case of discrimination, the Foundation

> need prove no more than that the conduct of the defendant[s] actually or predictably results in ... discrimination; in other words, that it has a discriminatory effect. The plaintiff need make no showing whatsoever that the action resulting in ... discrimination in housing was ... motivated [by a desire to discriminate against the handicapped.] Effect, and not motivation, is the touchstone.

*United States v. City of Black Jack, Missouri*, 508 F.2d 1179, 1184–5 (8th Cir.1974), *cert. denied*, 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975) (footnotes and citations omitted). This method of proving a violation of the Act relieves the plaintiff of the onerous burden of proving discriminatory intent. The court first addresses whether, given the facts of this case, a disparate impact analysis is appropriate.

The defendants argue the court should not use a disparate impact analytical framework to analyze this case because the plaintiff's evidence only addresses the alleged adverse impact to the plaintiff and its prospective tenants, not to handicapped people in general. They further argue that, because the plaintiff is challenging a procedural requirement rather than a substantive restriction on housing opportunities, a disparate impact theory is inappropriate. The plaintiff argues this is a classic disparate impact case because the defendants' actions have denied the Foundation's prospective residents, a protected class under the Act, the right to live in the residence of their choice in Fairfield and no other family group has ever been subjected to this requirement in Fairfield. The plaintiff contends no substantive restriction is necessary in a disparate impact case because impact does not refer to a particular

**19.** The defendants' asserted justifications are discussed at greater length in connection with the disparate impact analysis.

type of conduct but rather to the type of proof necessary to establish a violation of the Act. It argues proof of the imposition of terms and conditions on the Foundation and its prospective tenants that are not imposed on other non-infected unrelated family groups and that interfere with the Foundation's ability to provide housing for HIV-infected persons is sufficient to establish such a violation.

The Second Circuit has stated a disparate impact analysis examines a facially-neutral policy or practice, such as a hiring test or zoning law, for its differential impact or effect on a particular group, whereas a disparate treatment analysis involves differential treatment of similarly situated persons or groups. *Huntington Branch, N.A.A.C.P. v. Town of Huntington*, 844 F.2d 926, 933 (2d Cir.1988). The question in this case is whether it is proper to consider within a disparate impact framework a specific application of a facially neutral zoning provision that allegedly disparately impacts the plaintiff and all of its, as yet unidentified, prospective tenants who are members of a protected class under the Fair Housing Act. The Second Circuit has observed this is not an easy inquiry: "The line [between a case requiring a disparate impact analysis and one requiring a disparate treatment analysis] is not always a bright one...." *Huntington Branch, N.A.A.C.P.*, 844 F.2d at 934 (citations omitted).[20]

In *Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032 (2d Cir.1979), the Second Circuit stated that the disparate impact analysis has been used in cases addressing discrimination against individuals:

> While most of the cases have pondered the nature of the prima facie case in the context of actions that affect a large group of people, the question has also been considered, and the effects test

adopted, in suits brought to redress discrimination against individual plaintiffs. *Id.* at 1038.[21] The Seventh Circuit has found courts must use their discretion in determining whether a given case supports a finding of statutory relief:

> Although we agree that a showing of discriminatory intent is not required under section 3604(a), we refuse to conclude that every action which produces discriminatory effects is illegal. Such a per se rule would go beyond the intent of Congress and would lead courts into untenable results in specific cases. Rather, the courts must use their discretion in deciding whether, given the particular circumstances of each case, relief should be granted under the statute.

*Metropolitan Housing Development Corp. v. Village of Arlington Heights*, 558 F.2d 1283, 1290 (7th Cir.1977), *cert. denied*, 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978).

District courts that have addressed this issue since the Act was amended have found that a disparate impact analysis is appropriate in similar situations. *See Association of Relatives and Friends of AIDS Patients*, 740 F.Supp. at 103 (disparate impact theory appropriate where agency denied HIV-infected plaintiffs and a non-profit corporation a special use permit to open an AIDS hospice claiming land on which hospice was located was zoned exclusively for agricultural purposes); *Ardmore v. City of Akron*, Ohio No. 90–1083 at 10 (N.D.Ohio Aug. 2, 1990) (disparate impact theory appropriate where plaintiff non-profit organization refused to apply for a conditional use permit required by city for residential group home for five mentally retarded adults); *Baxter*, 720 F.Supp. at 732 (disparate impact theory appropriate where city denied developer a special use permit to remodel a former office building

---

**20.** The *Huntington* court held a Title VIII violation can be established without proof of discriminatory intent. *Huntington Branch, NAACP*, 844 F.2d at 935. Noting the relevance of the methodology used in Title VII litigation, the court stated that an intent requirement would strip the statute of all impact on de facto segregation. *Id.* at 934.

**21.** The *Robinson* court cited the Eighth Circuit in *Smith v. Anchor Bldg. Corp.*, 536 F.2d 231, 233 (8th Cir.1976), which stated, "The concept of the prima facie case applies to an individual housing discrimination case." *Robinson*, 610 F.2d at 1038 (citing *Smith*, 536 F.2d at 233).

to be used as a hospice for HIV-infected persons).

The court agrees with the *Huntington Branch, N.A.A.C.P.* court that "clever men may easily conceal their motivations." 844 F.2d at 935. As the Seventh Circuit stated: "As overtly bigoted behavior has become more unfashionable, evidence of intent has become harder to find. But this does not mean that ... discrimination has disappeared." *Metropolitan Housing Development Corp.*, 558 F.2d at 1290. In this case, the Town has applied a facially neutral zoning requirement in a way that treats handicapped people, a protected class under Title VIII, differently than other unrelated family groups. This decision impacts not only the plaintiff Foundation but also the whole group of its prospective tenants who are handicapped within the meaning of the Act. The court finds, given the unique facts of this case, the plaintiff does not have to satisfy the more difficult task of proving discriminatory intent to establish a violation of the Act and can instead prove such a violation by showing the defendants' conduct disparately impacts handicapped people. Such a finding is consistent with the fact that courts have broadly interpreted Title VIII in order to effectuate the Congressional purpose in enacting it. *See, e.g., Havens Realty Corp. v. Coleman*, 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982); *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972).

■ The court also finds the defendants' argument that a disparate impact analysis cannot apply to a procedural requirement unpersuasive. *See* Ardmore, at p. 8. The legislative history of the amendments to the Act are insightful as to Congress' intent concerning procedural requirements:

These new subsections would also apply to state or local land use and health and safety laws, regulations, practices or decisions which discriminate against individuals with handicaps. While state and local governments have authority to protect safety and health, and to regulate use of land, that authority has sometimes been used to restrict the ability of individuals with handicaps to live in communities. This has been accomplished by such means as the enactment or imposition of health, safety or land-use requirements on congregate living arrangements among non-related persons with disabilities. Since these requirements are not imposed on families and groups of similar size of other unrelated people, these requirements have the effect of discriminating against persons with disabilities.

The Committee intends that the prohibition against discrimination against those with handicaps apply to zoning decisions and practices. The Act is intended to prohibit the application of special requirements through land-use regulations, restrictive covenants, and conditional or special-use permits that have the effect of limiting the ability of such individuals to live in the residence of their choice in the community.

H.R.Rep. No. 100–711, 100th Cong., 2d Sess. 24, *reprinted in* 1988 U.S.Code Cong. & Admin.News at 2185. House Report, 1988 U.S.Code Cong. & Admin.News at 2185. The court finds Congress clearly intended that a procedural requirement could be found to be violative of the Act.

In *Ardmore v. City of Akron*, Ohio No. 90–1083 (N.D.Ohio Aug. 2, 1990), the district court also faced a situation in which the plaintiff was alleging a procedural requirement violated the Act:

[T]his case, by coincidence or design, poses an additional factor for consideration. In all the cases cited to the court plaintiffs have been denied some type of license or permit to operate a facility for the handicapped in the community. In the case at bar, plaintiff was not denied a conditional use permit. On the contrary, Ardmore withdrew its application before the City council ever considered it, alleging that the application *process* itself is discriminatory under the Fair Housing Amendments Act of 1988.

*Id.* at 8–9. The *Ardmore* court granted a preliminary injunction enjoining the defendant from requiring a special exception

procedure for a group home for the retarded. It stated, "These new enactments and the explicitly stated legislative intent to prohibit the requirement of conditional use permits tend to weigh heavily in projecting a likelihood of success on the merits in this case. Although the City imposes these conditional use permit requirements on other non-family style group residences as well, those groups are not protected under the FHAA." *Id.* at 10.

Under a disparate impact analysis, a *prima facie* case is established by showing the challenged practice of the defendant actually or predictably results in discrimination; in other words that it has a discriminatory effect. *Huntington Branch, N.A.A.C.P.,* 844 F.2d at 934. The plaintiff does not need to show that the defendants' decision was made with discriminatory intent. *Id.* The discriminatory effect of a rule can arise in two contexts: adverse impact on a particular protected group and harm to the community generally by the perpetuation of segregation. *Id.* at 937 (citing *Metropolitan Housing Development Corp.,* 558 F.2d at 1290). The court finds the defendants' conduct in this case had a discriminatory effect in each of these contexts.

The Commission required the Foundation to submit to a procedure in order to use its property that would be required of no other group of seven unrelated people planning to live together in this section of Fairfield. The defendants argue this procedure is simple, can quickly be completed, and serves the important purpose of allowing the Commission to gather facts to make a determination whether the proposed use is consistent with the goals and objectives of the zoning code. The plaintiffs, however, argue that the special exception procedure is fraught with special requirements the defendants may impose at their discretion and that there are a number of highly discretionary bases for the rejection of an application, which, if relied upon by the defendants, would be extremely burdensome for the plaintiff to challenge in court.

Section 27 of the Regulations states that the applicant for a special exception shall be required to submit a site plan,[22] architectural plan, reports from the Town fire marshall and director of health, a certificate of necessity from the state Department of Health, and "such additional information as the Commission may deem reasonably necessary to make a decision on the application." The process includes one night of public hearings and, if the exception is granted, allows for a challenge by the abutting neighbors and allows the Commission to impose conditions and modifications on a proposal and the Town to monitor compliance with these conditions.

The plaintiff has represented that the neighbors of the Oldfield property have stated their intent to prosecute such an appeal if a special exception is granted.[23] Plaintiff's Post Hearing Reply Brief at p. 6. The defendants asserted at oral argument that the possibility of an appeal by the neighbors is a "red herring." Even if an appeal were taken, they contend, the Foundation could begin immediate operation of the house in the absence of a preliminary injunction enjoining enforcement of the special exception. The plaintiff argues, however, that it is quite possible that it would have to await an appellate decision before it could utilize the property because Conn.Gen.Stat. § 8–8(g) includes a provision for a restraining order pending the appeal.

The court finds requiring the plaintiff to apply for a special exception has a discriminatory impact on HIV-infected persons because it holds the future tenants up to public scrutiny in a way that seven unrelated non-HIV-infected persons would not be. *See Ardmore,* at 11.[24] In addition, the

---

**22.** The Regulations give the Commission the discretion to waive this requirement. § 27.2.2.

**23.** If the special exception is granted, any person owning land that abuts or is within a radius of 100 feet of the property may file an appeal of the decision pursuant to Conn.Gen.Stat. § 8–8(a)(1).

**24.** The *Ardmore* court found, "Congress strongly and clearly articulated its intent to protect handicapped individuals' right to procure adequate housing in the community without being singled

process has the potential of being burdensome and, based on the previous public hearings dealing with this case, could be quite controversial and unpleasant and further inflame public opposition to the Foundation's plans. If the exception were granted and the neighbors took an appeal, it could also be expensive for the plaintiff.

██ Although the plaintiffs did not argue the issue, the court also finds that requiring HIV-infected persons who desire to live in a residential community to satisfy requirements which are not required of non-infected persons perpetuates the segregation of the handicapped. *See Huntington Branch, N.A.A.C.P.*, 844 F.2d at 937; *Metropolitan Housing Development Corp.*, 558 F.2d at 1290. This is another discriminatory effect of the defendants' conduct. Given the extreme fear the HIV virus engenders and the misconceptions held by so many, to allow the Town to impose a facially neutral requirement that has the effect of holding handicapped people up to public scrutiny in a way that non-handicapped people are not is to violate the purpose of Title VIII. This harms the entire Town by perpetuating the segregation of the handicapped in housing. *Contra Baxter*, 720 F.Supp. at 732 (finding this kind of discriminatory effect was not applicable).

██ The plaintiff made a *prima facie* showing of disparate impact. The court next must consider if the defendants can nonetheless avoid liability under Title VIII: that is, whether they presented bona fide and legitimate justifications for their action with no less discriminatory alternatives available.[25] *Huntington Branch, N.A.A.C.P.*, 844 F.2d at 939. The defendants assert they have a substantial legit-

imate interest in making a factual inquiry concerning proposed uses that involve charitable institutions or chronic and convalescent nursing homes to ensure that these uses conform with the objectives of its zoning regulations. The Second Circuit has found, however, that "[t]hough a town's interests in zoning requirements are substantial, they cannot, consistently with Title VIII, automatically outweigh significant disparate effects." *Id.* at 937 (citations omitted). Given the facts of this case, the court finds defendants' alleged justifications for their actions are not legitimate. From the information it possessed at the time of its decision, the Commission could not have reasonably concluded the proposed use was that of a chronic and convalescent nursing home or that of a charitable institution.

The court also finds there are less discriminatory alternatives available to address the Town's concerns. If the Town is sincerely interested in obtaining from the Foundation additional information relevant to zoning concerns, rather than attempting to classify the proposed residence as a chronic and convalescent nursing home or a charitable institution, it can use less formal means to obtain it.[26] The Town can use its traditional police powers to ensure the property is used in a manner conforming with a Residence B zone, to address any health or law enforcement problems that may arise, and to protect the welfare of prospective tenants and the neighborhood. If the plaintiff operates the house in a manner in violation of the Regulations, the Town can investigate and issue a cease and desist order as it could with any other residential property.

out for discriminatory public scrutiny." *Id.* at 11.

**25.** The defendants rely on *Ward's Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989), for the proposition that the burden of proof in a Title VIII disparate impact claim never shifts to the defendant. The plaintiff argues the *Ward's Cove* holding is limited to Title VII employment law and has never been extended. The court finds it unnecessary to resolve this dispute because the plaintiff has

presented ample evidence to demonstrate the disparate effect of the defendants' actions regardless of how the burden of proof is allocated.

**26.** The court notes the defendants' purported need for additional information is suspect in light of Mr. Devonshuk's testimony that, after his initial contact with Attorney Lehn he had all the information that he, and the Foundation, needed to make a decision. Transcript at pp. 763–765.

In balancing the Town's justifications against the plaintiff's showing of discriminatory effect, two other factors weigh in the plaintiff's favor. *Huntington Branch, N.A.A.C.P.,* 844 F.2d at 940. First, the plaintiff seeks only to enjoin the municipal defendant from imposing requirements on it that will have the effect of interfering with its attempt to provide housing rather than attempting to compel the defendant itself to provide housing. Second, the court's finding of evidence of discriminatory treatment in this case weighs heavily in favor of the plaintiff. The court concludes the plaintiff's showing of discriminatory effect easily outweighs the purported justifications of the defendants.

The plaintiff, therefore, has demonstrated a likelihood of success in establishing a violation of § 3604(f) of the Act under both a discriminatory treatment and a discriminatory impact analysis.

2) Likelihood of Success Under § 3617

 Section 3617 states:

It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title.

The court finds the evidence presented at the hearing supports the plaintiff's claim under § 3617 of the Act. Given the court's findings as to the plaintiff's claims under § 3604(f), the court concludes the Foundation is likely to succeed in proving the defendants' requirement that it apply for a special exception for its property constituted an interference with the Foundation's rights under § 3604. *See Baxter,* 720 F.Supp. at 733.

3) Likelihood of Success under § 3604(f)(3)(B)

 Section 3604(f) states:

For purposes of this subsection, discrimination includes—

. . . . .

(B) a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling. . . .

The legislative history indicates that this section requires affirmative steps to change rules or practices if they are necessary to allow a handicapped person to use or enjoy a dwelling.

The concept of "reasonable accommodation" has a long history in regulations and case law dealing with discrimination on the basis of handicap. A discriminatory rule, policy, practice or service is not defensible simply because that is the manner in which such rule or practice has traditionally been constituted. This section would require that changes be made to such traditional rules or practices if necessary to permit a person with handicaps an equal opportunity to use and enjoy a dwelling.

H.R.Rep. No. 100–711, 100th Cong., 2d Sess., 25, *reprinted in* 1988 U.S.Code Cong. & Admin.News 2173, 2186 (citation omitted).

The defendants argue the Foundation is perfectly capable of applying for a special exception and there is, therefore, no need to waive this requirement to ensure an equal opportunity to use and enjoy a dwelling. The plaintiff, citing the statute and its legislative history, contends the only exception to the reasonable accommodation requirement is an individual who constitutes a "direct threat" and a "significant risk of harm to the health and safety of others." Because the defendants have stipulated that health risks were not a part of the Commission's decision, the plaintiff argues, in the absence of undue hardship, the defendants must waive the requirement of the special exception.

The court has found the defendants have not demonstrated a legitimate zoning basis for their decision to require the Foundation to apply for a special exception. The court, therefore, need not address the issue of whether, presuming the defendants had articulated a legitimate basis, they would

nonetheless be required to waive the requirement because of the Act's reasonable accommodation mandate.

The court notes, however, based on the totality of the evidence presented at the preliminary injunction hearing, even if the defendants had proven there was a legitimate basis for the Commission's decision, the plaintiff raised sufficiently serious questions going to the merits of its reasonable accommodation claim to make them fair ground for litigation. The plaintiff also established that the balance of the hardships tips decidedly in its favor. The alleged harm to the Town is its concern about resultant inconsistent zoning enforcement. This concern is insufficient to outweigh the harm to the Foundation and its prospective tenants if it is required to apply for a special exception. The plaintiff, therefore, satisfied the requirements for injunctive relief on its reasonable accommodation claim.

CONCLUSION

The issues raised surrounding the AIDS epidemic are difficult ones. As the court in *Association of Relatives and Friends of AIDS Patients* observed:

> No one will deny that the AIDS epidemic ... has generated great cause for concern. No one can blame the residents of any town for making a priority of the health and safety of their families and community. But when legitimate concern is fanned by a profound misunderstanding of the causes of AIDS, the rush to panic can easily result in illegal and unjustifiable discrimination against not only the disease's victims but also against the laudable efforts of individuals working to contain the flames.

740 F.Supp. at 107.

The plaintiff has satisfied the requirements for issuance of a preliminary injunction on each of its claims. The court, therefore, grants the plaintiff's motion [Docket Number 40] for a preliminary injunction. The defendants are preliminarily restrained and enjoined from requiring a special exception in connection with the plaintiff's stated use of the Oldfield Road residence or from taking any zoning en-

forcement action against the plaintiff or the plaintiff's future tenants for failure to obtain a special exception. No security shall be required of plaintiff, the court finding no evidence that damages will be suffered by the defendants if it is subsequently found they have been wrongfully enjoined.