OXFORD HOUSE, INC., a Delaware not-for-profit corporation; Oxford House—Virginia Beach, an unincorporated association; Oxford House—Chicks Beach, an unincorporated association; Oxford House—Lake Shores, an unincorporated association; and Oxford House—Tidewater, an unincorporated association, Plaintiffs,

v.

CITY OF VIRGINIA BEACH, VIRGINIA, a municipal corporation, Defendant.

Civ. A. No. 2:92CV980.

United States District Court,
E.D. Virginia,
Norfolk Division.

July 2, 1993.

Stephen Barkai Pershing, ACLU Foundation of Virginia, Frank Morris Feibelman, Feibelman & Erdmann, Richmond, VA, for plaintiffs.

Lawrence Steven Emmert, William M. Macali, Office of the City Atty., Virginia Beach, VA, for defendant.

## MEMORANDUM OPINION AND ORDER

PAYNE, District Judge.

This action arises as a consequence of plaintiffs' efforts to maintain group housing for recovering alcohol and drug abusers in areas zoned for "single family" dwellings in Virginia Beach, Virginia (the "City"). The City's zoning ordinance defines a "family" to include groups of no more than four people unrelated by blood or marriage, *see* Va. Beach Code Zoning Ordinance § 111, but provides that group homes of more than four unrelated persons are permitted uses in each of the City's ten residential districts upon the award of a conditional use permit. *See* Va. Beach Zoning Ordinance § 501. Because the group homes maintained by plaintiffs all house more than four unrelated people, the City informed plaintiffs that, in order to comply with applicable zoning law, they either would have to reduce to four the number of persons living in the homes or apply for a conditional use permit. *See* Va. Beach Zoning Ordinance §§ 221, 501.

Plaintiffs refused to pursue either option and instead commenced this action for declaratory and injunctive relief, claiming that the City's zoning scheme, as applied to them, violates their rights under the Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.,* as amended by the Fair Housing Amendments Act of 1988 (the "FHAA"), the Rehabilitation Act of 1973, 29 U.S.C. § 794, as amended (the "Rehabilitation Act"), and the Americans With Disabilities Act (the "Disabilities Act"), 42 U.S.C. §§ 12132 *et seq.* The City has moved to dismiss the complaint under Fed.R.Civ.P. 12(b)(6). Alternatively, the City claims that plaintiffs' claims are not ripe, and hence present no "case or controversy," until plaintiffs apply for conditional use permits.

To the extent that plaintiffs claim that they are exempt from the requirement that they apply for a conditional use permit, which applies to all private groups of more than four unrelated persons, the court grants the motion to dismiss. The court further holds that, until requests for conditional use permits are made and acted upon by the City, plaintiffs' challenge to the City's zoning scheme as applied to them is premature.

## STATEMENT OF FACTS

The salient facts alleged in the complaint are as follows. Plaintiff Oxford House, Inc. is a Delaware not-for-profit corporation whose primary purpose is to provide recovery programs for recovering former alcohol and drug abusers. Oxford House, Inc. assists the approximately 400 Oxford Houses nationwide with, among other things, obtaining start-up loans and providing various pro-

gram-related support services. In this regard, Oxford House "maintains a contractual relationship with the Virginia Department of Mental Health, Mental Retardation and Substance Abuse Services under which the Commonwealth provides revolving loan funds [obtained through federal grants] ... under the terms of § 2036(a)(1) of the Anti–Drug Abuse Act of 1988." *See* 42 U.S.C. § 30Ox–4a (Compl. ¶ 5). The "Oxford House model" recovery program has as its centerpiece the establishment of "self-governing units of from four to fifteen persons who form coherent and disciplined households chartered as 'Oxford Houses.'" (Compl. ¶ 4). There are no resident counsellors or staff at any of the Oxford Houses. According to the Oxford House charter, any resident of an Oxford House who uses drugs or alcohol is expelled from the program. Each resident is required to be employed and to contribute funds toward the maintenance of the group home.

In accord with this program, plaintiffs Oxford House—Virginia Beach, Oxford House—Chicks Beach, Oxford House—Lake Shores, and Oxford House—Tidewater, all unincorporated associations chartered by Oxford House, Inc., rented single-family dwellings at various locations in the City for the purpose of establishing group homes for recovering former substance abusers. More than four persons unrelated by blood or marriage currently reside in each of the plaintiff houses, though the complaint does not specify the exact number of residents.

The City's zoning ordinance permits group homes to operate in any of the City's ten residential districts only if they obtain a conditional use permit. *See* Va. Beach Zoning Ordinance § 501. Applications for conditional use permits must be filed with the planning director, reviewed by the planning com-

mission, and ultimately approved by the city council. *See id.* at § 221. The zoning ordinance requires notice of the proposed conditional use and a public hearing before the planning commission and the city council. Prompted by complaints from the Lake Shores Civic League concerning the operation of Oxford House—Lake Shores, a City zoning inspector visited Oxford House—Lake Shores in September 1991 to verify the home's compliance with local zoning requirements. Thereafter, zoning officials issued a notice of violation on the ground that the house contained an impermissible number of unrelated persons. Upon learning of this notice, Oxford House, Inc., lodged a complaint with the United States Department of Housing and Urban Development ("HUD") under the Fair Housing Act on behalf of Oxford House—Lake Shores. After an administrative investigation, HUD found no violation of the Fair Housing Act because the City applies its "unrelated persons" restriction to all unrelated individuals, whether or not they are handicapped.

After HUD concluded its investigation, City zoning officials wrote to the four local Oxford Houses and informed them of the City's intention to take legal action against them unless they complied with the City's zoning code by "'either ... reduc[ing] the number of unrelated adults in the Oxford House residences ... to no more than (4) or ... apply[ing] for a conditional use permit.'" (Compl. ¶ 18). Rather than pursue either option, plaintiffs filed this action. Specifically addressing the City's suggested modes of complying with the zoning ordinance, the complaint essentially alleges that for financial and therapeutic reasons, the number of residents cannot be reduced to four.[1] Compl. ¶ 19. The complaint also alleges that it is not "fair or feasible" to require plaintiffs to apply

---

1. The complaint also alleges that the Oxford House Model calls for the size of group homes to be from "four to fifteen people." (Compl. ¶ 4). This allegation suggests that, for therapeutic purposes, Oxford House group homes can operate within the parameters of the City's "unrelated persons" ordinance, and that the real barrier to establishing the Oxford Houses in the City is financial. That is, with only four residents, the group homes cannot afford to operate in all areas of the City, at least not in those areas in which they currently are established. It is extremely doubtful that such financial barriers to housing can alone be grounds for a claim of discrimination under the Fair Housing Act, the Rehabilitation Act, or the Disabilities Act. The court need not reach that issue, however, because if accorded an interpretation most favorable to plaintiffs, the complaint alleges that therapy suffers when Oxford Houses are limited to four or fewer residents.

for a conditional use permit because the application process will expose the residents "to effectively unrestricted public scrutiny of their personal lives and histories" that "can be expected by itself to cause plaintiff households to disintegrate." (Compl. ¶ 21).

In broad and conclusory terms, the complaint alleges that the City's inspection, and subsequent citation, of Oxford House—Lake Shore and Oxford House—Chicks Beach constitutes intentional discrimination against plaintiffs because of their members' handicap, and hence violates the Fair Housing Act. The complaint further alleges that the conduct of the City in notifying all four local Oxford Houses that they were violating the zoning ordinance, and in insisting that plaintiffs comply with the ordinance or reduce the number of occupants to four (which plaintiffs call a "citation"), has the effect of discriminating against them by reason of their members' handicap and also violates the Fair Housing Act. Finally, plaintiffs allege that the City's refusal to waive its four "unrelated persons" limitation, together with its insistence that plaintiffs apply for conditional use permits, constitute a failure to make "reasonable accommodations" in the enforcement of the City's zoning ordinance in violation of the Fair Housing Act, the Rehabilitation Act, and the Disabilities Act.

The City moved to dismiss the complaint under Fed.R.Civ.P. 12(b)(6). After oral argument on the motion to dismiss, the court requested the parties to submit briefs on whether plaintiffs have standing to pursue this action and on whether plaintiffs' failure to apply for conditional use permits renders their attack on the City's zoning scheme, as applied to them, premature.[2]

## DISCUSSION

■ In ruling on a motion to dismiss under Fed.R.Civ.P. 12(b)(6), the court must ascertain whether the factual allegations in the complaint, taken as true and viewed in the light most favorable to the plaintiff, "constitute 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Republican Party of North Carolina v. Martin*, 980 F.2d 943, 952 (4th Cir.1992). The court is not required, however, to accord a presumption of truthfulness to legal conclusions or deductions that are alleged or drawn from pleaded facts. *E.g., Mitchell v. Archibald & Kendall, Inc.*, 573 F.2d 429, 432 (7th Cir.1978); *Albany Welfare Rights Org. Day Care Center, Inc. v. Schreck*, 463 F.2d 620, 623 (2d Cir.1972), *cert. denied*, 410 U.S. 944, 93 S.Ct. 1393, 35 L.Ed.2d 611 (1973); *see also* 2A *Moore's Federal Practice* ¶ 12.07[2.-5], pp. 12–65, 12–66 (2d ed. 1993). In reviewing the sufficiency of the complaint, the court is mindful that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his [or her] claim which would entitle him [or her] to relief." *Id.* (citing *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)).

■ The court first considers the City's motion to dismiss plaintiffs' claims under the Fair Housing Act. A review of the Act's statutory framework and legislative history is helpful in understanding plaintiffs' claims. In 1988, the Fair Housing Act was amended to, among other things, extend its protections to the handicapped. *See* Fair Housing Amendments Act of 1988, P.L. No. 100–430, 102 Stat. 1619 (1988). In relevant part, the Fair Housing Act now makes it unlawful

(1) To discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of—

(A) that buyer or renter;

(B) a person residing or intending to reside in that dwelling after it is sold or rented, or made available; or

---

2. The City does not dispute that plaintiffs have standing to bring this action, either to vindicate the rights of their resident members under a theory of "associational standing," *see, e.g., Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977); *Greater Los Angeles Council* *on Deafness, Inc. v. Zolin*, 812 F.2d 1103, 1115 (9th Cir.1987) or, arguably, to seek redress in their own right. *See, e.g., Stewart B. McKinney Foundation, Inc. v. Town Plan & Zoning Comm'n*, 790 F.Supp. 1197, 1209 (D.Conn.1992); *Ardmore, Inc. v. City of Akron*, No. 90–CV–1083, 1990 WL 385236 at *2 (N.D.Ohio Aug. 2, 1990).

(C) any person associated with that buyer or renter.

(2) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling ... because of a handicap of [any person listed in (A) through (C) above].

42 U.S.C. § 3604(f)(1) and (2). The statute defines discrimination to include "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B).

In light of the recent decision by the United States Court of Appeals for the Fourth Circuit in *United States v. Southern Management Corp.*, 955 F.2d 914 (4th Cir.1992), holding that recovering former alcohol and drug abusers who were denied housing opportunities qualified as "handicapped" under the Fair Housing Act, the parties do not dispute that the Fair Housing Act applies to plaintiffs and the members of the group homes they operate. Nor do the parties dispute that the Fair Housing Act applies to local zoning ordinances that discriminate against the handicapped in obtaining housing. *See* 42 U.S.C. § 3615 (providing that "any law of a State, a political subdivision, or other jurisdiction that purports to require or permit any action that would be a discriminatory housing practice under this subchapter shall be to that extent invalid.").

Indeed, the legislative history of the FHAA specifically addresses application of the Fair Housing Act to zoning ordinances. According to the House Report:

[The FHAA provisions on handicapped discrimination] also apply to state or local land use ... laws, regulations, practices or decisions which discriminate against individuals with handicaps. While state and local governments have authority to protect safety and health and to regulate the use of land, that authority has sometimes been used to restrict the ability of individuals with handicaps to live in communities. This has been accomplished by such means as the enactment or imposition of ... land use requirements on congregate living arrangements among non-related persons with disabilities. *Since these requirements are not imposed on families and groups of similar size of other unrelated people, these requirements have the effect of discriminating against people with disabilities.*

The Committee intends that the prohibition against discrimination against those with handicaps apply to zoning decisions and practices. *The Act is intended to prohibit* the application of *special requirements* through land use regulations, restrictive covenants, and *conditional or special use permits that have the effect* of limiting the ability of such individuals to live in the residence of their choice in the community....

Another method of making housing unavailable to people with disabilities has been the application or enforcement of *neutral rules and regulations* on ... land use in a manner which discriminates against people with disabilities.

H.R.Rep. No. 711, 100th Cong., 2d Sess. 24 (1988), *reprinted in* 1988 U.S.C.C.A.N. 2173, 2185 ("House Report") (emphasis added).

Unlike certain zoning practices discussed in the House Report, the zoning scheme at issue, which defines a family to include not more than four unrelated persons and requires all groups of more than four unrelated persons who wish to occupy single family dwellings to apply for conditional use permits, applies to *all* unrelated persons, and thus creates no "special requirements," in the form of conditional use permits or otherwise, for unrelated handicapped individuals. *Cf. City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (holding that a zoning ordinance requiring special use permits for homes for the mentally retarded but not for other group homes violated the Equal Protection Clause as applied to plaintiff group home). The City's zoning scheme is therefore a facially neutral rule that allegedly has been applied in a discriminatory manner to plaintiffs because the City has informed plaintiffs that they must comply with it.

■ A person claiming to be aggrieved by a discriminatory housing practice can seek

administrative relief by filing a complaint with HUD. *See* 42 U.S.C. §§ 3610, 3612. Alternatively, an aggrieved person can commence a civil action in federal court and bypass the HUD administrative process. *See* 42 U.S.C. § 3613; *see also* House Report at 39, *reprinted in* 1988 U.S.C.C.A.N. at 2200 (stating that "[a]n aggrieved person is not required to exhaust the administrative process before filing a civil action. The Committee intends for the administrative proceeding to be a primary, but not exclusive, method for persons aggrieved by discriminatory housing practices to seek redress."). In any event, once in federal court, a plaintiff can establish a violation of the Fair Housing Act by demonstrating either intentional discrimination or discriminatory impact, *see, e.g., Betsey v. Turtle Creek Assocs.,* 736 F.2d 983, 986 (4th Cir.1984); *People Helpers Foundation, Inc. v. City of Richmond,* 781 F.Supp. 1132, 1134 (E.D.Va.1992); *Oxford House—Evergreen v. City of Plainfield,* 769 F.Supp. 1329, 1343 (D.N.J.1991), or a refusal to make reasonable accommodations for the handicapped. *See, e.g., Stewart B. McKinney Foundation, Inc. v. Town Plan and Zoning Comm'n,* 790 F.Supp. 1197, 1221–22 (D.Conn:1992).

Mindful of these legal principles, the court proceeds to evaluate the City's motion to dismiss plaintiffs' Fair Housing Act claim. Despite the apparent breadth of the Act's coverage, it does not encompass all land use regulations. As the City correctly points out, by its terms, the Fair Housing Act does not apply to, among other things, "any reasonable local, State, or Federal restrictions regarding the maximum number of occupants permitted to occupy a dwelling." 42 U.S.C. § 3607(b)(1). Relying on the decision of the United States Court of Appeals for the Eleventh Circuit in *Elliot v. City of Athens,* 960 F.2d 975 (11th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 376, 121 L.Ed.2d 287 (1992), the City contends that its ordinance permitting a maximum of four unrelated individuals to occupy a single-family dwelling constitutes a reasonable maximum occupancy restriction and is therefore exempt from coverage under the Act. Based on the plain language of 42 U.S.C. § 3607(b)(1) and the legislative history of the FHAA, however, the court finds

this argument, and the reasoning of *Elliot,* unpersuasive.

■ In considering the City's position, the court initially observes that exemptions from the Fair Housing Act are construed narrowly. *See, e.g., United States v. Columbus Country Club,* 915 F.2d 877, 883 (3d Cir. 1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2797, 115 L.Ed.2d 971 (1991). Commenting on the exemption for reasonable restrictions on the "maximum number of occupants," the House Report notes that "[a] number of jurisdictions limit the number of occupants per unit based on a minimum number of square feet in the unit or in the sleeping areas of the unit. Reasonable limitations by governments would be allowed to continue, as long as they were applied to *all occupants.*" House Report at 31, *reprinted in* 1988 U.S.C.C.A.N. at 2192 (emphasis added). Simply stated, the legislative history confirms what the plain meaning of the statute says, namely, that a maximum occupancy limitation is one that restricts the total number of *all* occupants, regardless of whether they are related or unrelated. *See Elliot,* 960 F.2d at 985–86 (Kravitch, *J.,* dissenting) (examining language and legislative history of 42 U.S.C. § 3607(b)(1) and concluding that, because an unrelated persons ordinance does not apply to all persons, it is not a maximum occupancy limitation).

In *Elliot,* however, the majority rejected this argument and held that an ordinance limiting the maximum number of unrelated persons who could live together in a single-family dwelling constituted a maximum occupancy restriction within the meaning of 42 U.S.C. § 3607(b)(1). The majority based its analysis primarily on cases discussing the constitutionality of "unrelated persons" restrictions, not on the language and legislative history of the Fair Housing Act. The majority first observed that in *Village of Belle Terre v. Boraas,* 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974), the Supreme Court rejected an equal protection challenge to an ordinance that restricted the number of unrelated persons who could live together, concluding that the ordinance was rationally related to legitimate interests in controlling population density and preserving quiet,

open spaces for families. The majority next noted that in *Moore v. City of East Cleveland*, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977), the Supreme Court held that an ordinance that limited occupancy of dwellings to single families, but that defined a family so narrowly as to preclude a grandmother from living with her grandson, violated the Due Process Clause of the Fourteenth Amendment.

Based on *Belle Terre* and *Moore*, the *Elliott* majority concluded that, because zoning restrictions on unrelated persons were constitutional, notwithstanding similar limitations on related persons, and because of the prevalence of such ordinances, Congress intended the exemption for maximum occupancy limitations to apply to unrelated persons restrictions. *Elliott*, 960 F.2d at 980. The *Elliott* court went on to observe that it did "not believe that Congress intended that the maximum occupancy limitation would apply *only* to a limitation on the number of persons per square foot of a dwelling space." *Id.* Therefore, according to the majority, "Congress was merely giving examples of the type of restrictions on occupancy that would be reasonable." *Id.*

■ This reasoning is unpersuasive. Whether restrictions on the number of unrelated persons are constitutional does not control whether such restrictions constitute

maximum occupancy limitations under the Fair Housing Act. Moreover, in discussing the relevant legislative history, the majority in *Elliott* ignores the unambiguous statement that maximum occupancy limitations are permissible if "applied to *all* occupants," without qualification. House Report at 31, *reprinted in* 1988 U.S.C.C.A.N. at 2192 (emphasis added); *see also Elliott*, 960 F.2d at 985–86 (Kravitch, *J.*, dissenting). Considering the obligation narrowly to construe exemptions from the Fair Housing Act, and considering the language and legislative history of the statute, the court concludes that the City's unrelated persons restriction is not a maximum occupancy limitation within the meaning of 42 U.S.C. § 3607(b)(1).[3]

■ The City next contends that there is no "case or controversy" because plaintiffs have failed to exhaust their administrative remedies by applying for conditional use permits, or, alternatively, because plaintiffs' claims of handicap discrimination are premature, and therefore unripe for judicial review. Plaintiffs counter that they need not exhaust administrative remedies before bringing this civil rights claim. *See Patsy v. Florida Bd. of Regents*, 457 U.S. 496, 516, 102 S.Ct. 2557, 2568, 73 L.Ed.2d 172 (1982) (plaintiff need not exhaust administrative remedies before bringing action under 42 U.S.C. § 1983).

**3.** Dissenting in *Elliott*, Judge Kravitch suggests that the majority's construction of § 3607(b)(1) may have been motivated by its belief that based on *Moore*, it would be unconstitutional to apply a maximum occupancy limitation to families. *Elliott*, 960 F.2d at 986 & n. 1 (Kravitch, *J.*, dissenting). As a result, in the majority's view, construing the exemption for maximum occupancy limitations to apply only to restrictions on unrelated persons was necessary to "save" the statute by giving all of its provisions meaning and protecting it from possible constitutional infirmity. *Id.* at 986. The Supreme Court has not, however, squarely addressed whether maximum occupancy limitations could be applied to families. Indeed, in *Moore*, the Court held only that a city's restrictive (non-numerical) definition of a "family" was too tenuously related to the objectives of controlling overcrowding, congestion, and noise, not that all restrictions on the maximum number of persons who could occupy a dwelling, whether related or unrelated, were unconstitutional. 431 U.S. at 500, 97 S.Ct. at 1936. In this regard, the Court noted that the city already had an ordinance designed to limit overcrowding by limiting

the maximum occupancy of a dwelling to the amount of habitable floor area, which the plaintiff family did not violate. *Id.* at 500, n. 7, 97 S.Ct. at 1936, n. 7; *see also Moore*, 431 U.S. at 520, n. 16, 97 S.Ct. at 1946, n. 16 (Stevens, *J.*, concurring) (suggesting that a city could limit population density by enacting restrictions on the total number of occupants in a dwelling.). *But see Doe v. City of Butler*, 892 F.2d 315, 321 (3d Cir.1989).

In any event, neither party has raised the constitutional issue discussed in the *Elliott* dissent. However, assuming it would be unconstitutional to apply a maximum occupancy limitation to families, the court agrees with Judge Kravitch that, given the plain language and legislative history of § 3607(b)(1), it is not possible to interpret the maximum occupancy limitation provision to cover unrelated person restrictions. *Elliott*, 960 F.2d at 986 (Kravitch, *J.*, dissenting) (observing that court has "duty to give effect, *if possible*, to every clause and word of a statute, rather than emasculate a section.") (emphasis added) (citation omitted).

Plaintiffs argue that they have a federal right under the Fair Housing Act to occupy any dwelling in a residential district, making resort to the discretionary conditional use permit process inappropriate in this case. Specifically, plaintiffs claim that, because applying for conditional use permits may expose their residents to unwanted public scrutiny in the course of the required zoning hearings, the City can fulfill its duty to reasonably accommodate plaintiffs only by waiving application of its unrelated persons restriction without requiring plaintiffs to apply for permits. Put differently, plaintiffs assert that, because of the threat of potentially unfavorable publicity, it is unreasonable to make them apply for a permit. In this regard, plaintiffs assert that, to the extent they claim that the permit application process itself violates their rights under federal law, resort to that process cannot be a precondition to bringing suit in federal court.

■ The court agrees that plaintiffs suffering an actual injury need not exhaust administrative remedies through HUD, or HUD-certified state agencies, before bringing claims in federal court under the Fair Housing Act. *See, e.g., Oliver v. Foster*, 524 F.Supp. 927, 929 (S.D.Tex.1981); House Report at 39, *reprinted in* 1988 U.S.C.C.A.N. at 2200 ("An aggrieved person is not required to exhaust the administrative process before filing a civil action. The Committee intends for the [HUD] administrative proceeding to be a primary, but not exclusive, method for persons aggrieved by discriminatory housing practices to seek redress."). However, given the procedural posture of this action, the issue presented is one of ripeness, not one of administrative exhaustion. Distinguishing the two concepts, the Supreme Court has observed:

> While the policies underlying the ... concepts [of exhaustion and ripeness] often overlap, the finality [or ripeness] requirement is concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury; the exhaustion requirement generally refers to administrative and judicial procedures by which an injured party may seek review of an adverse

decision and obtain a remedy if the decision is found to be unlawful or otherwise inappropriate.

*Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 193, 105 S.Ct. 3108, 3120, 87 L.Ed.2d 126 (1985) (holding that constitutional challenge brought under 42 U.S.C. § 1983 to application of zoning ordinance was not ripe until the aggrieved party applied for a variance). *See also Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 297, 101 S.Ct. 2352, 2371, 69 L.Ed.2d 1 (1981). Although *Williamson County* involved a takings challenge to a zoning ordinance, not a claim of handicap discrimination, its analysis of ripeness and exhaustion applies with equal force to the facts presented here.

In applying the principles of the ripeness doctrine, it is important to remember that plaintiffs do not attack the City's zoning ordinance on its face, because the unrelated persons ordinance applies to all unrelated individuals, regardless of handicap. Instead, plaintiffs contend only that the ordinance has been applied to them in a discriminatory manner because they have been told that they must comply with it. Unlike an administrative scheme that must be exhausted before judicial relief can be sought, the conditional use permit process is in no way remedial. *See Williamson County*, 473 U.S. at 191, 105 S.Ct. at 3118. The zoning scheme will not be conclusively "applied" to plaintiffs, and have no final "effect" on them (discriminatory or otherwise), until they request a conditional use permit and afford the City an opportunity to act on their requests. Simply stated, because plaintiffs may be granted a conditional use permit if they apply for one, their discrimination claim is unripe in the most fundamental sense. *See, e.g., Williamson County*, 473 U.S. at 193, 105 S.Ct. at 3120; 13A Wright & Miller, *Federal Practice and Procedure* § 3532.2, p. 138 (2d ed. 1984) (observing that "[m]any cases deny ripeness on the straightforward basis that the anticipated events and injury are simply too remote and uncertain to justify present adjudication."); James A. Kushner, *Fair Housing Discrimination In Real Estate, Community Development, and Revitalization* § 8.23

(1983) (observing that "[w]here the agency must issue permits, the controversy is not ripe until the decision to issue or withhold is made.").

In this regard, the court observes that, by defining discrimination under the Fair Housing Act to include the "refusal to make reasonable accommodations in rules, policies, [and] practices," Congress obviously contemplated providing cities, among others, the opportunity to adjust their generally applicable rules to allow handicapped individuals equal access to housing. See 42 U.S.C. § 3604(f)(3)(B). The zoning process, including the hearings on applications for conditional use permits, serves that purpose. Indeed, were it otherwise, federal courts increasingly would become entangled prematurely in disputes regarding application of neutral zoning ordinances to the handicapped. Federal courts would thus become not zoning boards of appeals, but zoning boards of first instance, a result Congress surely did not intend. Cf. Gardner v. City of Baltimore Mayor and City Council, 969 F.2d 63, 69 (4th Cir.1992).

 Plaintiffs nevertheless contend that, because of the potentially adverse and harmful publicity associated with the conditional use permit process, the City cannot insist that plaintiffs apply for a permit and, in any event, that the City has no discretion under the Fair Housing Act to deny permits to plaintiffs, thereby rendering the application process superfluous. The court observes that, to the extent that plaintiffs attack the application process itself, they have stated a ripe claim. The court therefore proceeds to consider plaintiffs' argument in two parts: first, whether the City generally has discretion to deny conditional use permits to handicapped applicants; and second, whether the threat of unfavorable publicity is sufficient to exempt plaintiffs from the requirement of applying for conditional use permits.

 Contrary to plaintiffs' first argument, local zoning authorities are not without discretion to deny handicapped plaintiffs conditional use permits. Indeed, inherent in the concept of "reasonable accommodation", as established by the Fair Housing Act, is that

the interest of, and benefit to, handicapped individuals in securing equal access to housing must be balanced against the interest of, and burden to, municipalities in making the requested accommodation under the facts of each case. In requiring reasonable accommodation, therefore, Congress surely did not mandate a blanket waiver of all facially neutral zoning policies and rules, regardless of the facts. Certainly nothing in the language of the statute requires this result. Moreover, the need for such balancing is evident in the context of land use and zoning ordinances, where cities have important interests in regulating traffic, population density and services to ensure the safety and comfort of all citizens, including those who are handicapped. See, e.g., Elliot, 960 F.2d at 982.

In this instance, facts are collected and interests are balanced through the process of applying for a conditional use permit. Requests to grant conditional use permits, or variances from occupancy restrictions, might be reasonable or unreasonable depending on numerous factors, including the number of proposed occupants and their proposed use of the premises in relation to the surrounding community. The complaint in this case, for example, does not list the number of individuals currently residing in each house. It is entirely possible that, in one geographic area, legitimate municipal interests will permit a group home with only four or five occupants, while in another area a home with ten or twelve occupants could be appropriate. Given the many legitimate factors that can influence a zoning decision, it cannot be said that the outcome of the permit application process is preordained, even for handicapped applicants, thereby making application unnecessary.

 Furthermore, contrary to plaintiffs' claims, vindication of their federal rights in no way depends on the "discretionary" local zoning process. As discussed above, the zoning process is not remedial in nature because, unless and until plaintiffs are denied a conditional use permit or the required conditions are established, the City has not fully applied its zoning scheme to them and, consequently, plaintiffs' claims of

discrimination, based on theories of discriminatory effect or failure to make reasonable accommodation, are not ripe for adjudication and are dismissed.[4] Once the City reaches a decision, plaintiffs may seek judicial redress if they continue to think themselves aggrieved. At that time, a judicial decision on the legitimacy of any grievance plaintiffs claim as a consequence of the City's zoning decision may be made on the basis of the facts presented in support of the application for the conditional use permit and the decision actually made by the City on the case presented to it.

Plaintiffs argue, however, that they should not be required to use the permit process applicable to all residents of the City because they claim (in a conclusory manner) that the process may cause them harm by exposing their residents to allegedly invasive public scrutiny. This argument too misses the mark. The Fair Housing Act protects handicapped individuals from discrimination. It does not, and plaintiffs point to no provision of the statute suggesting otherwise, insulate such individuals from legitimate inquiries designed to enable local authorities to make informed decisions on zoning issues, such as whether, or on what terms, to grant conditional use permits. More particularly, by requiring "reasonable accommodations in rules, policies, practices or services" if necessary to afford handicapped persons "an equal opportunity to use and enjoy a dwelling," the Fair Housing Act contemplates that municipalities will engage in informed decision making respecting application of their zoning ordinances. Congress is presumed to have known that public hearings are procedural prerequisites for zoning variances or conditional uses; and, if Congress had intended to exempt handicapped persons from participation in the usual procedural requirements of the zoning process, it could have do so expressly. Perhaps Congress elected not to follow that course because a fundamental tenet of the FHAA, and, for that matter, the Rehabilitation and Disabilities Acts, is to integrate handicapped individuals into society, not to further remove them from the normal and usual incidents of citizenship, such as participation in the public components of zoning decisions, to the extent that participation is required of all citizens whether or not they are handicapped.

More importantly, perhaps, the complaint does not allege that the residents of the plaintiff houses will even have to appear at public hearings. Indeed, plaintiffs do not dispute that applicants for variances and conditional use permits often do not to attend public hearings, but instead are represented by counsel, experts, or by another spokesperson.

For the foregoing reasons, the court concludes that plaintiffs can claim no legally

4. To the extent plaintiffs claim that the City's mere insistence that they comply with the generally applicable zoning code constitutes intentional discrimination under the Fair Housing Act, the complaint fails to allege facts sufficient to permit an inference of discriminatory intent, and it also is dismissed. *See e.g.,* Fed.R.Civ.P. 12(b)(6); *Albany Welfare Rights Org. Day Care Center, Inc. v. Schreck,* 463 F.2d 620, 623 (2d Cir.1972) (conclusory allegations of discrimination insufficient to state claim under 42 U.S.C. § 1983), *cert. denied,* 410 U.S. 944, 93 S.Ct. 1393, 35 L.Ed.2d 611 (1973); *Simmons v. John F. Kennedy Medical Center,* 727 F.Supp. 440, 442 (N.D.Ill.1989) (conclusory allegations of racial discrimination fail to state a claim under 42 U.S.C. § 1981). The City's zoning code contains a numerical definition of a "family" (four or fewer unrelated persons) that the plaintiff households clearly do not satisfy. *Cf. Oxford House–Evergreen v. City of Plainfield,* 769 F.Supp. 1329, 1333, 1341 (D.N.J. 1991) (holding that plaintiffs were likely to succeed on claim of intentional discrimination under the Fair Housing Act when, in applying its *non-numerical* definition of "family" (which turned on subjective concepts of permanency and domesticity) to plaintiff Oxford House, the defendant city first concluded that plaintiff's house was a permitted use, but changed its conclusion in response to public opposition to the plaintiff house.). Moreover, that the City was alerted to the operation of certain plaintiff houses by organized citizens groups does not transform the City's enforcement of its generally applicable law into intentionally discriminatory conduct in violation of the Fair Housing Act. The complaint does not allege, for example, that the City has enforced its ordinance against plaintiffs differently then against any other group of unrelated individuals who the City knows resides together in clear violation of applicable law. If plaintiffs are denied a conditional use permit, or are subjected to what they perceive to be discriminatory conditions, plaintiffs can, of course, renew their claim that *those* actions were motivated by a discriminatory animus. *See id.* at 1333.

cognizable right under the Fair Housing Act to be exempt from the permit application process simply because of the *public nature* of that process.

*Stewart B. McKinney Foundation, Inc. v. Town Plan & Zoning Comm'n,* 790 F.Supp. 1197 (D.Conn.1992), upon which plaintiffs heavily rely, is not to the contrary. There, the court considered, among other things, whether preliminarily to enjoin the municipality from requiring the plaintiff, who intended to establish a group home for HIV-infected individuals, to apply for a special exception from zoning ordinances. In requesting injunctive relief, the plaintiff claimed ."that being forced to apply for a special exception in order to use its property is burdensome and discriminatory under the Fair Housing Act because it imposes special terms and conditions on the occupancy of its property that would not be imposed if the prospective tenants were not HIV-infected." *Id.* at 1209. In granting the injunction, the court noted, among other things, that the plaintiff's proposed residents met the definition of "family" contained in the zoning code and that "the Commission required the Foundation to submit to a procedure ... that would be required of no other group of seven unrelated people planning to live together." *Id.* at 1213, 1219. In contrast, the permit application process in the instant case applies to *all* unrelated groups of more than four persons who desire congregate living arrangements.

Plaintiffs' reliance on *Oxford House, Inc. v. Township of Cherry Hill,* 799 F.Supp. 450 (D.N.J.1992) and *Ardmore, Inc. v. City of Akron,* No. 90 CV 1083, 1990 WL 385236 (N.D.Ohio 1990) is similarly unavailing because those decisions are either distinguishable or based on unpersuasive analysis. In *Cherry Hill,* the defendant township denied the plaintiffs, a local Oxford House and its prospective residents, a certificate of occupancy for the plaintiff's proposed group home because the plaintiffs did not satisfy the non-numerical definition of a single family under the defendant's zoning ordinance. Alleging violations of the Fair Housing Act, the plaintiffs sought to enjoin the township from in-terfering with their immediate occupancy of the premises.

In discussing the irreparable harm prong of the preliminary injunction inquiry, the court in *Cherry Hill* considered the township's argument that, because the plaintiffs had not applied for a zoning variance, it was premature to conclude that they had suffered irreparable harm. Rejecting this argument, the court reasoned that, because resort to the variance process took time and because plaintiffs could not occupy the house while the application was pending, plaintiffs would suffer an enhanced chance of relapse and harm absent immediate injunctive relief. *Cherry Hill,* 799 F.Supp. at 464. The court's conclusion that the delay inherent in the application process would irreparably harm the plaintiffs also provided the basis for its conclusion that the township violated the Fair Housing Act. *See Id.* at 464 n. 30 (also noting, among other things, that the defendant imposed "more onerous procedural requirements on plaintiffs than are imposed on others."). Here, of course, the members of the plaintiff houses currently reside there, and there is no allegation that the City has initiated proceedings to alter that situation.

In a footnote, the *Cherry Hill* court noted that "for obvious reasons," the plaintiffs would prefer "to remain anonymous" and "would be hesitant to testify in a public hearing." *Id.* at 464 n. 29. The court further theorized that "pursuit of such an avenue [might] cause harm to plaintiffs by forcing them to identify themselves publicly as addicts." *Id.* That dictum is without decisional support and hence the court cannot accept it as the basis for a claim of discrimination under the Fair Housing Act. As explained above, the court finds no support for the theory that Congress intended the Fair Housing Act to exempt handicapped individuals from the zoning process simply because of the public nature of that process.

In *Ardmore,* another preliminary injunction case, the plaintiff not-for-profit corporation proposed to operate a group home, categorized by the defendant city as a "Residential Social Service Facility," for five mentally retarded adults and one full-time staff person. The city required the plaintiff to obtain

a conditional use permit to operate the facility, but did not require "families," defined to include groups of five or fewer unrelated persons, to obtain such permits in order to live together. *Ardmore*, 1990 WL 385236 at *2. It also appears that the defendant did not require all private groups of unrelated individuals who desired congregate living arrangements, such as nursing homes, to apply for conditional use permits. *Id.* In any event, the plaintiff applied for a conditional use permit, but then withdrew its application and filed suit. Among other things, the plaintiff claimed that "the [application] process was discriminatory and the resultant publicity would be harmful to the prospective residents." *Id.*

Although observing that all of the cases cited by the plaintiff involved parties who were denied permits or licenses, the court in *Ardmore* granted the preliminary injunction, concluding that plaintiff had a likelihood of success under a disparate impact theory. *Id.* at *4. As support for its conclusion, the court drew on the legislative history of the FHAA, which indicated that the FHAA was intended to prohibit: (1) land use regulations that applied to handicapped persons who desired congregate living arrangements, but not to families or to other groups of similar size; and (2) "special requirements" through, for example, conditional use permits, that had the effect of discriminating against the handicapped. *Id.* (citation omitted). From this, the court found a "legislative intent to prohibit the requirement of conditional use permits" and "to protect handicapped individuals' right to procure adequate housing in the community without being *singled out* for discriminatory public scrutiny." *Id.* (emphasis added).

■■■■ To the extent that the *Ardmore* court concluded that the Fair Housing Act was intended to ban conditional use permits altogether, it misreads the legislative history. The portions of the legislative history cited deal with requirements that apply especially to handicapped individuals, *i.e.*, that "single handicapped persons out" for scrutiny and that have a discriminatory effect on them. Here, perhaps unlike the situation prevailing in *Ardmore*, no group of unrelated individuals is "singled out" on the basis of handicap or otherwise. Moreover, although facially neutral conditional use permit requirements can perhaps operate with a discriminatory effect, plaintiffs have alleged no facts to support such a claim in this action. Simply invoking the conclusory phrase "discriminatory impact," as the *Ardmore* plaintiffs apparently did, is insufficient to state a claim upon which relief can be granted. *See, e.g., Mitchell v. Archibald & Kendall, Inc.*, 573 F.2d 429, 432 (7th Cir.1978); *Albany Welfare Rights Org. Day Care Center, Inc. v. Schreck*, 463 F.2d 620, 623 (2d Cir.1972), *cert. denied*, 410 U.S. 944, 93 S.Ct. 1393, 35 L.Ed.2d 611 (1973). Moreover, in this case, plaintiffs' only objection to applying for a permit is that their residents will be subjected to public scrutiny, which the court already has concluded is not the type of "injury" the Fair Housing Act was intended to prevent. To the extent *Ardmore* suggests otherwise, the court declines to adopt that analysis.

In sum, plaintiffs' claim that the City's unrelated persons restriction, as applied to them, violates the Fair Housing Act is not ripe for adjudication until plaintiffs apply for conditional use permits and afford the City an opportunity to act on those applications. Plaintiffs' claim that they need not apply for a permit because of potentially unfavorable publicity is a legally insufficient basis under the Fair Housing Act to attack the permit application process, and that claim is therefore dismissed.

■■■■ The court now turns to plaintiffs' claims of handicap discrimination under the Rehabilitation Act and under the Disabilities Act. Plaintiffs advance the same claim under each statute, namely, that the City has discriminated against them "by failing to make reasonable accommodations in the application of its zoning code." To reasonably accommodate them, plaintiffs contend that the City must waive its unrelated persons restriction without requiring plaintiffs to apply for conditional use permits. For the reasons set forth above, however, the court holds that plaintiffs' claim that they are exempt from applying for conditional use permits because of the possible attendant publicity is insufficient as a matter of law. The

requirement of public decision-making simply does not make the application process unreasonable or violative of the statutes here at issue. Until plaintiffs have applied for and have been denied a permit, or have been required to comply with what they perceive as discriminatory conditions, their claims of discrimination are premature.

The City additionally contends that plaintiffs have failed to state a claim under the Rehabilitation Act because they have not alleged that the City's zoning enforcement scheme constitutes a "program or activity" within the meaning of the Act. *See* 29 U.S.C. § 794 (outlawing discrimination against "otherwise qualified individual[s] with handicaps" in "any program or activity receiving Federal financial assistance."). The City also argues that the Disabilities Act does not cover disputes arising from the enforcement of local zoning ordinances. *See Burnham v. City of Rohnert Park*, No. C 92–1439 SC (N.D.Cal. May 18, 1992). Because the court has ruled that, as a matter of law, plaintiffs must apply for conditional use permits, and, consequently, that the remainder of plaintiffs' claims are not now ripe, the court need not address these arguments at this time.

## CONCLUSION

For the foregoing reasons, the court dismisses plaintiffs' claims that they are exempt from applying for conditional use permits and that the City has intentionally discriminated against plaintiffs merely by insisting that plaintiffs comply with the City's generally applicable zoning law. The court further holds that plaintiffs' claims that the City has applied its zoning scheme to them in a discriminatory manner because of their handicap is not ripe for adjudication and must be dismissed without prejudice to their right to challenge the City's zoning decision subsequently if their applications for conditional use permits are denied or if the conditions imposed give rise to a claim. Accordingly, the City's motion to dismiss this action is granted and it is ORDERED dismissed.

It is so ORDERED.